**UNITED STATES of America**

v.

**Rohn Martin ISHMAEL, Debra K. Ishmael.**

**No. 9:93CR22.**

United States District Court, E.D. Texas, Lufkin Division.

Feb. 11, 1994.

George Patrick Black, Federal Public Defender, Tyler, TX, for Rohn Martin Ishmael.

Richard Lee Moore, Asst. U.S. Atty., Tyler, TX, for U.S.

## CORRECTED ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS

ROBERT M. PARKER, Chief Judge.

On December 16, 1993, the Motions to Suppress Evidence filed by Defendants Rohn Martin Ishmael and Debra K. Ishmael came on for hearing. The motions allege identical grounds for suppression and will be treated as a single motion.

The question before the Court concerns the limitation, if any, on the Government's ability to use thermal imaging devices to detect concealed underground illegal activity. The issue was spawned by the tension created between the right to privacy on the one

hand and our society's rapidly evolving technological sophistication on the other. Left unchecked, technology has the potential to restrict, as a practical matter, the right to privacy to the confines of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). We must take care that the war on drugs not count as one of its victims fundamental rights. The benefits to our society of safeguarding the right to privacy is such that the courts must say that there is a limit to the use of technological weapons, even in the war on drugs.

## FACTS

In late summer of 1992, Drug Enforcement Administration (DEA) Task Force Officer (TFO) Paul Black received information that a confidential witness had delivered large quantities of concrete remix to Defendant Rohn Ishmael at a secluded wooded rural location in Nacogdoches County, Texas and had been paid in cash. The witness had observed that Defendant was mixing the concrete remix himself and driving to a deep ravine in another area on the property where a construction project was underway. The witness also observed that Rohn Ishmael appeared nervous or suspicious and did not want anyone to go down to the construction site. Black and another TFO entered the property in September of 1992 and conducted surveillance, which revealed two mobile homes, some large plastic tanks, and a goose neck trailer containing numerous sections of PVC pipe, but no illegal activity.

About a year later, on August 9, 1993, TFO Black and three other law enforcement officers went back to the property. On this trip the officers followed a roughly built road from the mobile home at the front of the property to a large dug out next to a two acre pond. There they saw a small quantity of concrete remix, a dump truck and a concrete mixer that had been parked in the dug out with weeds growing up around them.

The next day, TFO Black determined, based on various computerized data banks, that Rohn Ishmael's criminal history included possession, distribution, and growing of marijuana. Black also determined that the property under surveillance was part of a 130 acre tract, which Rohn and Debra Ishmael purchased in 1991.

On August 13, 1993, law enforcement officers flew over the property and took numerous photographs. These photographs show a mobile home near the road frontage and a large steel building (40′ × 80′ × 15′) about 200–300 yards behind the mobile home, next to the two acre pond. Also four large tanks and numerous vehicles and trailers were observed.

Surveillance officers entered the property on August 18, 1993 and again on August 19, 1993. On these trips they observed an exhaust fan near the top of the building running continuously, and a water pump and pipes running from the pond to the building at an angle that the officers believed would allow the pipe to enter the building approximately ten feet below the foundation. TFO Black concluded that Ishmael had built a basement under the building, which would account for the large amount of concrete he purchased in excess of that required to build a six inch slab under the building.

On August 19, 1993, at 4:00 a.m., law enforcement officers flew over the property at approximately 1000–1500 feet in a helicopter equipped with a thermal imager, referred to as a Forward Looking Infra Red Device (FLIR). The device records in visual images the differences in temperature on the surfaces of objects. The video tape made during the flyover shows that the metal building and a nearby brush pile were considerably hotter that the surrounding land and woods.

On September 16, 1993, law enforcement agents again entered the property, this time with a handheld thermal imager. The tape made also shows that the metal building and the brush pile were hotter than the surrounding area. The officers observed pressurized water flowing from the building into the pond on this trip.

TFO Black compiled a list of purchases and phone calls made by Rohn Ishmael which indicated that he had made extensive purchases of construction equipment and supplies, electrical supplies, and farm and garden supplies during 1991–1993. Black also submitted electrical use records for the

mobile home and the metal building that showed increased use of electricity beginning in June 1993 in both structures. Electrical usage in the building exceeded that of the mobile home during June and July, but was less than the household usage in August. Black's investigation revealed that the Rohn Ishmael's business, R & M Equipment Rental, did not have a local telephone listing. Officers that had entered the property to conduct surveillance on seven different occasions (some of which were at night) had not seen any signs, vehicle traffic or people around the building, from which they concluded that the building was not the site of a legitimate business operation.

Based on the above information, TFO Black swore out an affidavit which formed the basis of the magistrate's finding of probable cause for a warrant to search Rohn and Debra Ishmael's property. That search warrant was executed on September 29, 1993, and revealed a marijuana growing operation in the basement of the metal building. The defendants have moved to suppress all the items seized in the search, which included, among other things, 770 marijuana plants and some fire arms.

### BURDEN OF PROOF

▮ The movants must first establish a reasonable expectation of privacy and that the search and seizure took place without a search warrant. Then the burden of proof shifts to the government to establish that an exception to the search warrant requirement was applicable and that the search and seizure was, in fact, a reasonable one. *United States v. Bachner,* 706 F.2d 1121, 1126 (11th Cir.1983); *United States v. Harris,* 479 F.2d 508, 509 (5th Cir.1973).

In this case, the challenged thermal imaging tapes must first be analyzed to determine whether Defendants' Fourth Amendment rights were violated. If they were, the Court will then determine whether the warrant and the resulting search can survive without the information gathered with the thermal imaging devices.

### THERMAL IMAGING

The alleged probable cause for the search warrant was obtained by utilizing thermal imaging equipment which detected heat from the Defendants' buildings and property without a search warrant.

### A. Defendants' Burden

▮ Defendants begin by asserting that they had a reasonable expectation of privacy in the metal building, and in their property surrounding the metal building. *Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) sets out a two part inquiry to determine whether there is a constitutionally protected expectation of privacy in a particular area. First, has the individual manifested a subjective expectation of privacy in the object of the challenged search? The Court finds that the defendants did manifest such an expectation, by locating the building on a piece of secluded wooded rural property, in a deep ravine, out of sight of the nearby county road. Further, the affidavit noted that Rohn Ishmael bought and mixed and transported his own concrete, and constructed the basement and slab at a higher cost than a local contractor would have charged, so that others would not know about the basement under the building.

▮ The second inquiry is whether society is willing to recognize that expectation as reasonable. The test of legitimacy is not whether the individual chooses to conceal his activity, but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver v. United States,* 466 U.S. 170, 181–183, 104 S.Ct. 1735, 1742–1744, 80 L.Ed.2d 214 (1984).

▮ Defendants argue that the area in and around the building is within the curtilage of the their home. Although it is well established that an individual has a reasonable expectation of privacy in the curtilage of his home, there are no bright lines that determine where the curtilage of a home ends. The Supreme Court has enumerated four factors that the Court should consider in drawing the parameters of a claimed curtilage. *United States v. Dunn,* 480 U.S. 294,

107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). First, the Court must consider the proximity of the area to the home. Here, the metal building was about 200–300 yards from the mobile home. Second, the building was not within an enclosure surrounding the home, nor was there an enclosure around the mobile home that excluded the building. Third, the nature and uses to which the area is put must be considered. Evidence established that about one quarter of the interior area of the building was carpeted, equipped with a bathroom and a water heater, a refrigerator, exercise equipment, telephone and furnished as an office. Finally, considering the fourth factor, the Ishmaels went to great length to conceal the metal building from observation by passersby, to the extent that a person would have to trespass on or fly over secluded private property, with road frontage limited to an unpaved county road, to even be aware that the building existed.

■ The government, on the other hand, argues that the area immediately surrounding the building should be characterized for Fourth Amendment purposes as an "open field." To fall within the "open fields" doctrine the area "need be neither 'open' nor a 'field' as those terms are used in common speech." *Oliver v. United States,* 466 U.S. 170, 180, n. 11, 104 S.Ct. 1735, 1742, n. 11, 80 L.Ed.2d 214 (1984). Rather, the "open fields" doctrine refers to the unoccupied or undeveloped area outside of the curtilage that does not provide the setting for those intimate activities that the Fourth Amendment is intended to shelter from governmental interference or surveillance. *Oliver,* 466 U.S. at 179, 104 S.Ct. at 1741.

■ Although the building has some characteristics of home curtilage, the Court finds that it was not in the curtilage of the Ishmael's home. Further, to say that the government could intrude up to the very windows of the building on the basis of the "open fields" doctrine simply because it was outside the curtilage of a home, would eviscerate the Fourth Amendment. Rather, the Court finds the most accurate characterization of the property in question is that of a business. According to the affidavit of TFO Black, Rohn Ishmael was the proprietor of a business named R & M Equipment Rental, duly registered with the Texas State Comptroller's Office, located at Rt. 1 Box 180–B, Cushing, Texas (the address of the Ishmael's rural property). The affidavit also indicates that Ishmael made various purchases of commercial equipment under that business name during the time period that he was the target of TFO Black's investigation and that he discussed the electrical usage needs of his business with a utility company representative. Finally, the affidavit establishes that the metal building, equipped with an office and what appears to be a warehouse space, and the private property surrounding the building was not open to the public. The Fourth Amendment's ban on warrantless searches shields places of business as well as residences. *Marshall v. Barlow's Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). A business proprietor is free to choose what areas of his business he opens to the public. What is observable to the public, is observable by the Government without a warrant. *Id.* 436 U.S. at 315, 98 S.Ct. at 1822. The Court finds, based on the observation of law enforcement officials contained in the affidavit, that the Ishmaels did not invite or allow the public onto the business premises in question.

■ The fact that the officers in this case observed only the exterior of the building prior to obtaining the warrant brings us to the question of whether a business premises has a curtilage. While the term curtilage originally referred to that area protected by the sanctity of a home, *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the term "business curtilage" is now used by some courts to define the area around a business protected by the Fourth Amendment. *See, e.g. United States v. Swart,* 679 F.2d 698 (7th Cir.1982). Regardless of whether the term business curtilage is appropriate, the analysis must be bottomed on the reasonableness of defendants' expectation of privacy. The fact that the officers trespassed on the Ishmael's private land, by itself, has "little or no relevance to the application of the Fourth Amendment." *Oliver v. United States,* 466 U.S. 170, 184–84, 104 S.Ct. 1735, 1744, 80 L.Ed.2d 214 (1984). This

is so because the law of trespass extends to areas which are not protected by the Fourth Amendment. *Id.* The facts of this case compel the Court to find that while the officers' repeated trespass on some parts of the 130 acre tract would not have offended the Fourth Amendment, the Ishmaels had a reasonable expectation that their effects, associated with the secreted metal building and the business being conducted there, were safe from Governmental surveillance. This protection logically includes the water and air systems connected to the building, and the vehicles parked around the building.

 There is language in the affidavit concluding that R & M Equipment Rental was not a legitimate business, meaning, I presume, that the Ishmaels did not derive business revenues from renting equipment, but rather from the cultivation of marijuana. There is no authority for, and no logic in, creating an exception to the warrant requirement because law enforcement officials believe that a particular business is engaged in illegal activity.

 The thermal readings made during flyovers require yet another layer of analysis. The Fourth Amendment is not violated by naked-eye aerial observations of property, even if the property is within the curtilage of a home. *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). In *Ciraolo,* the police received an anonymous telephone tip that marijuana was growing in a suburban backyard, which was enclosed by two fences and shielded from view at ground level. The police secured a private airplane and flew over the yard at an altitude of 1,000 feet, within navigable airspace. During the overflight, the officers readily identified marijuana plants 8 feet to 10 feet high, growing in the backyard with their "naked eyes". The Supreme Court began its analysis by noting that the Fourth Amendment has never required law enforcement officers to shield their eyes when passing by a home on a public thoroughfare. Police, like any member of the public, could have glanced down during a flight within public navigable airspace and seen the *Ciraolo* marijuana with their naked eyes. Therefore, the homeowner could not reasonably expect privacy from aerial observation within his curtilage.

A variation on the overflight observation question was presented to the Supreme Court in *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989). In that case, criminal defendant Riley lived in a mobile home located on five acres of rural property. A greenhouse was located 10–20 feet behind the mobile home. Two sides of the greenhouse were enclosed. The other two sides were not enclosed but the contents of the greenhouse were not visible from any vantage point on surrounding property. The greenhouse was covered with roofing panels, but at the time of the overflight, two of the panels, amounting to approximately 10% of the roof area, were missing. Like *Ciraolo,* law enforcement officials received an anonymous tip that marijuana was being grown on the property. After determining that the contents of the greenhouse could not be seen from the road, an officer flew over the property in a helicopter at the height of 400 feet. The officer was able to identify marijuana growing in the greenhouse through the hole in the roof with his naked eyes. A plurality of the Supreme Court held that because the helicopter was flying within the legal altitude for helicopters (although lower than that allowed for fixed wing aircraft) and the marijuana was discernible to the naked eye from that height, Riley had no reasonable expectation of privacy from such observation. Justice O'Conner concurred that the observation passed Fourth Amendment muster, but stated,

> In determining whether Riley had a reasonable expectation of privacy from aerial observation, the relevant inquiry after *Ciraolo* is not whether the helicopter was where it had a right to be under FAA regulations. Rather consistent with *Katz,* we must ask whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity that Riley's expectation of privacy from aerial observation was not "one that society is prepared to recognize as 'reasonable.' " (citing *Katz, supra,* 389 U.S., at 361, 88 S.Ct. at 516.) *Florida v. Riley,* 488 U.S. at 454, 109 S.Ct. at 699.

These Fourth Amendment flyover cases inform this Court's decision in two ways. First, the Defendants have not carried their burden in establishing either that the flights over their property violated FAA regulations regarding altitudes and flight paths, or that the flights were below the altitude which members of the public travel with sufficient regularity to negate a reasonable expectation of privacy. It follows that the naked eye observations and photographs taken with standard camera during the flights are not excludable on Fourth Amendment grounds. Second, the holdings in both cases are explicitly limited to naked eye observations, and do not sanction recording thermal images from otherwise legal flights without a search warrant.

Based on the conclusions that 1) the defendants demonstrated a subjective expectation of privacy, 2) that the property in question is a business premises, not open to the public, and 3) that the thermal images were not the product of naked eye aerial observation, the Court finds that the Defendants had a reasonable expectation of privacy in the building and the surrounding property.

The Government conceded at the hearing that both the flyover and the handheld thermal imagery tapes were the product of earlier searches. The argument cannot be logically made, and the Government has not attempted to argue, that the use of thermal imaging equipment to make tapes of the heat differential on Defendants' property was not a search. Likewise, there is no contention that the Government had a search warrant prior to conducting these searches. The Defendants have therefore carried their burden of establishing a warrantless search of property in which they had a reasonable expectation of privacy.

B. Government's Burden

The burden has now shifted to the Government to establish that the thermal imaging searches fall within an exception to the warrant requirement, and were reasonable.

The Government first relies on its contention that the heat was in plain view. The thermal imaging tape made by equipment attached to a helicopter is analogized to the photographs taken by the mapmaking camera in *Dow Chemical Co. v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). In that case, Dow Chemical Company challenged the aerial surveillance and photography of its industrial complex by the Environmental Protection Agency on Fourth Amendment grounds. The Supreme Court began by reciting the rule that the public and the police may lawfully survey private property from the air. Although the photographs taken by the Government in *Dow Chemical* revealed slightly more detail than available to the naked human eye, the Supreme Court found that they did not give rise to constitutional problems. The Court specifically noted, however, that surveillance of private property using highly sophisticated surveillance equipment might be constitutionally proscribed absent a warrant. The Court finds that the thermal imaging equipment used by the government in this case was exactly the type of sophisticated technology that concerned the Supreme Court, and was therefore excepted from the *Dow* opinion's approval for warrantless searches. The thermal imaging tapes made by officers trespassing on private land using hand held equipment offend the Fourth Amendment for the same reason. Put most simply, the thermal images recorded by this technology were not in plain view from the aircraft or the ground.

The government next argues that the thermal imaging equipment is nonintrusive and detects only heat that is emitted into the atmosphere, and therefore abandoned. In *United States v. Penny-Feeney,* 773 F.Supp. 220 (D.Haw.1991),[1] police, in an attempt to corroborate a tip that the defendant's residence housed an indoor marijuana growing operation, flew over the defendant's house using a thermal imager. The images of the house and garage revealed heat radiating

---

1. The Ninth Circuit affirmed the district court's denial of the defendant's motion to suppress, finding that the Hawaii State Police demonstrated probable cause for the search independent of the thermal imagery readings, and so did not reach the issue before the Court in the present case. *United States v. Feeney,* 984 F.2d 1053 (9th Cir.1993).

from the garage roof, garage door and a joint between the garage and the house in an amount disproportionate to that coming from surrounding buildings. The officers concluded that the images were consistent with heat generated by artificial lights used to grow marijuana indoors, and relied on the thermal imagery results to establish probable cause for a subsequent search. The court held that by venting the heat outside using exhaust fans, the defendant had abandoned the heat. The court compared the vented heat to garbage left for collection outside of a home, and relying on *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), found that the defendant had no reasonable expectation of privacy in such "waste heat."

I am not persuaded that heat escaping from a building is the same as abandoned garbage. If the government has the right to repeatedly trespass, conduct visual searches from nearby open fields not protected as curtilage, and make frequent flyovers using FLIR and other advanced technology, all without a warrant, there is precious little left of the right to privacy. The Ishmaels went to great lengths to conceal their underground activity from human sensory detection. If a law enforcement agent had alleged in an affidavit that while conducting surveillance he felt an inordinate amount of heat being vented from the building, the waste heat analogy may have validity. However, to use high tech sensory devices to detect such heat creates a situation inapposite to abandoned garbage. The Court therefore rejects the Government's argument that the defendants abandoned their expectation of privacy by "allowing" the heat to radiate from the building and the air exhaust duct.

Finally, the Government argued that the use of thermal imaging is like using a dog to sniff for illegal drugs. The Supreme Court has held that using a drug detection dog to sniff luggage at an airport is not a search within the meaning of the Fourth Amendment. *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), states:

> A "canine sniff" by a well trained narcotics detection dog ... does not expose noncontraband items that would otherwise remain hidden from public view, as does, for exam-

ple, as officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a physical search. Moreover the sniff only discloses the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods. *Id.* 462 U.S. at 707, 103 S.Ct. at 2644.

The comparison of dog sniffs and FLIRs fails on two levels. First, the thermal imager cannot distinguish between "contraband heat" and "legal heat," so that the information garnered from such a technique is less limited, and thus results in more intrusion than a dog sniff. Second, a dog's sense of smell, while more acute than a human's, does not compare to a technology that can turn minute gradations in temperature into video tapes from 1500 feet away.

The Court finds that the Government has not met its burden of establishing an exception to the warrant requirement of the Fourth Amendment for thermal imaging devices. Consequently, the evidence gathered from the Ishmaels' property by use of such devices must be excluded from consideration when determining probable cause in this case.

## WAS THERE PROBABLE CAUSE ABSENT THE THERMAL IMAGERY EVIDENCE?

▆▆▆▆ The evidence remaining, absent the information gathered by the thermal imagery equipment, does not amount to probable cause to support the issuance of a search warrant. The Ishmaels built a building with a basement, and purchased various pieces of electrical and agricultural equipment. They were secretive and Rohn Ishmael had a criminal history involving violation of marijuana laws. But, there were no reports of law enforcement officers or informants who had

observed any marijuana or any other illegal activity by the Ishmaels. The evidence of their activity was consistent with developing a new patented strain of African Violets, and innumerable other perfectly legal activities.

Probable cause is established if the facts would lead a reasonable judge to believe the evidence sought will be found in the particularly described location. The issuing magistrate must evaluate the facts under the "totality of the circumstances" test. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The Court finds that, absent the thermal imagery information, the magistrate would not have had a "substantial basis" for concluding that the affidavit established probable cause in this case. *See, id.* at 236, 103 S.Ct. at 2331.

## CONCLUSION

It is therefore ORDERED that Defendants' Motions to Suppress are GRANTED. The Government will not be allowed to introduce evidence resulting from the execution of the search warrant in the trial of this cause.