**UNITED STATES of America, Appellant,**

v.

**Kevin C. REILLY, Defendant–Appellee.**

**No. 1787, Docket 95–1024.**

United States Court of Appeals, Second Circuit.

Argued July 21, 1995.

Decided Feb. 12, 1996.

Grant C. Jaquith, Assistant U.S. Attorney, Northern District of New York, Syracuse, NY, for Appellant.

James Kerrigan, Ithaca, NY, for Defendant–Appellee.

Before WINTER, LEVAL and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

■ The good faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984), helped free federal courts from a difficult dilemma. Before *Leon*, federal courts examining the constitutionality of a search had to choose between: (1) holding the search unconstitutional and excluding the evidence found, thereby significantly increasing the chances that a guilty person would go free, regardless of the heinousness of the crime at issue, or (2) finding the search constitutional, thereby condoning similar searches and injuring potentially innocent objects of future, highly intrusive investigations. *Leon* changed all that dramatically in cases where a search warrant has been issued. Under *Leon*, evidence is admitted when the police act with objective good faith pursuant to a search warrant, even if the magistrate erred in issuing the warrant. Where good faith exists, courts may thus correct erring magistrates and provide them with guidance without incurring the social cost of letting the guilty profit from decisions that define the boundaries of the Fourth Amendment.

■ It bears emphasis, however, that the good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts. Good faith is not a blanket excuse for any police behavior. A warrant is not a general hunting license, nor is it a mantle of omnipotence, which cloaks its holders in the King's power to "do no wrong." And perhaps most important, it is not an excuse if the police are not frank with the magistrate in proceedings to obtain the warrant—proceedings that are typically *ex parte*. *See Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978).

It is with these considerations in mind that we examine an area where the contours of search-and-seizure law are anything but clear, curtilage. In doing so, we write on a relatively clean slate. The Supreme Court issued a major opinion on the scope of curtilage, *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987), after *Leon* was decided. But this Circuit has not reviewed the protection afforded to curtilage since *Dunn* was handed down. Today, we are asked to decide whether the district court (Howard G. Munson, *Senior District Judge*) erred in concluding 1) that the police violated the Fourth Amendment by invading the defendant's curtilage and 2) that the evidence the police found was not protected by the good faith exception. We will first address the question of the validity of the search given the scope of curtilage, and then examine whether the good faith exception protects the evidence found in the search.

## BACKGROUND

■ Kevin Reilly's green thumb was allegedly both legendary and shady. Shunning corn, wheat, and other traditional crops, Reilly used his talents to grow marijuana on his 10.71 acre "farm" located on Woodard Road in Enfield, New York. His land has several characteristics important to our analysis. The property contains a main residence and a cottage. Between 1980 and 1982, Reilly built another house on the land, which he subsequently sold. Also during that time, Ruldolfo Nunez, who owns land bordering the east, west and north sides of Reilly's parcel, hired Reilly to build a wire fence along their common border. Nunez wanted the fence built to keep his cows from entering Reilly's land.

In the late 1980s, Reilly planted a lawn on his land. The lawn stretched from the main residence to the north and south boundaries of the farm, and by September of 1991, it entirely covered the property. Reilly planted trees throughout his land, including approximately 140 trees along the west hedgerow. He also built a pond and patio near the northeast corner of the land, and by these he erected a wooden gazebo. Close to the pond, patio, and gazebo is a cottage, which is about 375 feet from the main residence.

Reilly lived in the cottage from the time it was built (approximately 1984) until 1986. He then moved into the main residence, and rented the cottage until 1990. Thereafter it was vacant. While it was vacant, Reilly and

his guests occasionally used the kitchen and the bathroom in the cottage; he at times also used the cottage for sexual liaisons. In addition, Reilly used it to grow marijuana.

The police first visited Reilly's land in September of 1990. Two officers from the Tomkins County Sheriff's Department approached the land from the north. They walked south along the western fence line until they reached Woodard Road, the southern boundary of the property. They claim to have noticed a strong marijuana odor, but state that they did not enter the property because a dog was present. They did not come back again for another year.

On September 6, 1991, the two officers parked their car about 300 yards east of the main residence. They walked northwest towards the eastern fence of the property. The officers followed the fence to the northeast corner of the property, and then turned south to enter the property. They continued walking south, passing a vegetable garden, and the pond, gazebo, and patio. They then chanced upon the cottage. The cottage had windows on all sides, some of which were open. Attached to the side of the cottage, they found an air conditioner from which, the officers claim, came a strong marijuana odor. The officers tried to look into the windows near the air conditioner, but the windows were closed and covered by drawn curtains. The officers then walked to the north side of the building and looked through a window, where they saw an empty room. They looked through other windows and saw a bathroom and kitchen.

The officers finally walked south until they reached a copse, a wooded area about 125 feet from the cottage. In the copse, they discovered a clearing with about 20 marijuana plants. They left the property by the same route they had used to enter it.

Later that day, they obtained a search warrant. Upon its execution, they found about 15 marijuana plants in the cottage and about 115 plants growing in the wooded area. They also found one plant, some harvested marijuana, and implements for weighing and bagging in Reilly's main residence.

In 1992, Reilly was convicted in New York State court, pursuant to his guilty plea, of criminal possession of marijuana in the first degree and unlicensed growing of marijuana. In making his plea, Reilly retained the right to challenge the conviction on the ground that the marijuana that had been found was the fruit of an illegal search. Subsequently, and on this basis, his conviction was overturned and the indictment was dismissed by the Appellate Division of the New York State Supreme Court. *People v. Reilly*, 195 A.D.2d 95, 101, 606 N.Y.S.2d 836, 840 (3d Dep't 1994). The court held that the search of Reilly's property was illegal under New York's Constitution as applied in *People v. Scott*, 79 N.Y.2d 474, 486–89, 583 N.Y.S.2d 920, 927–29, 593 N.E.2d 1328, 1335–37 (1992). *Scott*, decided after Reilly's guilty plea, had held that under the New York Constitution open fields were protected from unreasonable searches. *Id.* In this respect, the New York Constitution gives greater protection from searches than does the federal Constitution. *See Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984). Thus, though the Appellate Division found that Reilly's cottage and wooded area were not protected curtilage, it held the search invalid under the New York open fields doctrine. 195 A.D.2d at 99–100, 606 N.Y.S.2d at 839–40.

The federal government subsequently filed an indictment against Reilly on June 30, 1994. Reilly was charged with manufacture of marijuana; criminal forfeiture of the property used to grow the marijuana was also sought. Reilly promptly moved to suppress the marijuana evidence, and the district court granted his motion. *United States v. Reilly*, 875 F.Supp. 108, 121 (N.D.N.Y.1994). Judge Munson first held that the scope of curtilage was a question of fact for the court to determine. He then rejected Reilly's claim that the cottage created its own curtilage. It had been unoccupied for nearly two years, and the defendant's occasional uses for the cottage did not measure up to "use as defendant's home." *Id.* at 117.

The court, nevertheless, found that the search invaded Reilly's curtilage. It noted that the cottage was 375 feet from the main

residence, that the wooded area was 125 feet away, that hedgerows and a fence enclosed the property, that no interior fencing subdivided the property, and that the whole area was well maintained and pastoral. These factors led the court to find that "an observer could reasonably conclude that the area in question 'harbors the intimate activity associated with the sanctity of a man's home and the privacies of life.'" *Id.* at 119–20 (quoting *Dunn*, 480 U.S. at 301, 107 S.Ct. at 1139) (internal quotation marks omitted).

The government raises two principal arguments on appeal. First, it contends that the search did not invade Reilly's curtilage. Second, it argues that even if the search did occur on Reilly's curtilage, the search fell within the good faith exception announced in *Leon.*

## DISCUSSION

### I. Curtilage

Over two hundred years ago, Blackstone, in his description of the common law of burglary, distinguished between curtilage and open fields. He explained that "if the barn, stable, or warehouse be a parcel of the mansion-house, and within the same common fence, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall." 4 William Blackstone, Commentaries * 225. Yet "no distant barn, warehouse, or the like are under the same privileges, nor looked upon as a man's castle of defence...." *Id.*

Blackstone's distinction found its way into American jurisprudence through an opinion by Justice Holmes, who held that "the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields. The distinction between the [open fields] and the house is as old as the common law." *Hester v. United States,* 265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924). Four years later, the Supreme Court

extended Justice Holmes' pronouncement to hold that no "search or seizure" occurred unless the government had made an "actual physical invasion of [the defendant's] house 'or curtilage.'" *Olmstead v. United States,* 277 U.S. 438, 466, 48 S.Ct. 564, 568, 72 L.Ed. 944 (1928).

*Hester* and *Olmstead* adopted the concept of curtilage, but its contours remained unclear until the Supreme Court's decision in *United States v. Dunn,* 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). Today, we are asked to determine whether the district court erred in finding that a cottage 375 feet from a house and a wooded area 125 feet from the house could, in the circumstances of this case, fall under the definition of curtilage set forth in *Dunn.*

■ We begin by noting that we review the district court's findings underlying the scope of curtilage as "essentially factual" ones, reversible only for "clear error." *United States v. Benish,* 5 F.3d 20, 24 (3d Cir. 1993). While this Circuit has not previously addressed the question of whether the scope of curtilage relies essentially on factual determinations, we see no reason to depart from the unanimous decisions of the other Circuits holding that it does. *See id.; United States ex rel. Saiken v. Bensinger,* 546 F.2d 1292, 1295–97 (7th Cir.1976), *cert. denied,* 431 U.S. 930, 97 S.Ct. 2633, 53 L.Ed.2d 245; *United States v. Friend,* 50 F.3d 548, 552 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 814, 133 L.Ed.2d 759 (1995); *United States v. Brady,* 993 F.2d 177, 178–79 (9th Cir.1993); *United States v. Traynor,* 990 F.2d 1153, 1156 (9th Cir.1993); *United States v. Knapp,* 1 F.3d 1026, 1029 (10th Cir.1993); *United States v. Hatch,* 931 F.2d 1478, 1480 (11th Cir.), *cert. denied,* 502 U.S. 883, 112 S.Ct. 235, 116 L.Ed.2d 191 (1991). We note, however, that while most curtilage cases concern factual determinations about use, privacy, and other such questions, which are reviewable for clear error only, these factual findings are themselves subject to a legal framework which is, of course, reviewable in a plenary fashion.[1]

---

1. The government argues that in *United States v. Paulino,* 850 F.2d 93, 95 (2d Cir.1988), *cert. denied,* 490 U.S. 1052, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989), we held that "a determination by a district court as to whether an act, or belief, or ... an expectation, is 'reasonable' is a

■ The clearly erroneous standard requires us to uphold the ruling of the court below unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). So long as "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). This rule is particularly important in this context, since "[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts." *United States v. Depew*, 8 F.3d 1424, 1426 (9th Cir.1993).

■ In determining whether the district court's curtilage analysis was correct, we are guided by *United States v. Dunn*. *Dunn* held that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." 480 U.S. at 300, 107 S.Ct. at 1139. It listed the following factors as relevant: 1) "the proximity of the area claimed to be curtilage to the home;" 2) "whether the area is included within an enclosure surrounding the home;" 3) "the nature of the uses to which the area is put;" and 4) "the steps taken by the resident to protect the

area from observation by people passing by." *Id.* at 301, 107 S.Ct. at 1139.

We therefore begin our analysis by looking to these four factors. But we do so fully conscious that the factors are not necessarily exclusive and that we are not, in any event, to apply them mechanically. Again we follow the Court in *Dunn* which warned: "We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

The touchstone of our inquiry, therefore, remains whether Reilly had a reasonable expectation of privacy in his cottage. *See Tri-State Steel Constr. v. Occupational Safety & Health Review Comm'n*, 26 F.3d 173, 178 (D.C.Cir.1994) (Williams, J., concurring in the result) (explaining *Dunn* as "a special case of the more general doctrine that a reasonable expectation of privacy is necessary for a successful 4th Amendment claim"), *cert. denied*, —— U.S. ——, 115 S.Ct. 1355, 131 L.Ed.2d 213 (1995). For, as Judge Henry Friendly aptly put it: "Terming a particular area curtilage expresses a conclusion; it does not advance Fourth Amendment analysis. The relevant question is ... whether

conclusion of law subject to plenary review." Fair enough. But the language quoted from *Paulino*, which concerned the "automobile exception" to the Fourth Amendment, refers only to the question of whether one can ever have a reasonable expectation of privacy in an automobile. And both of the cases on which *Paulino* relies distinguish between a broad legal question, such as whether in general an expectation of privacy in automobiles exists, and narrower questions regarding particular factual determinations by district courts. *See United States v. Shakur*, 817 F.2d 189, 196 (2d Cir.) (holding that while a district court determination about "whether an act is 'reasonable' usually is considered to be a legal conclusion," that "[d]etermining the weight to be accorded to each factor in reaching the ultimate finding as to the existence of conditions 'is the special province of the trier of fact.'") (citation omitted), *cert. denied*, 484 U.S. 840, 108 S.Ct. 128, 98 L.Ed.2d 85 (1987);

*United States v. Ceballos*, 812 F.2d 42, 46–47 (2d Cir.1987) (holding that while the question of whether a reasonable person would believe his person was seized was "normally a question of law," that the district court was still entitled to deference because its "determination in this case is inextricably intertwined with the credibility of the witnesses"). Consistent with these cases, we hold that the broad question of whether one can have a reasonable expectation of privacy in curtilage is a matter of law, and one settled by *Dunn*, just as the question of whether one can have a reasonable expectation of privacy in open fields is a question of law, and one settled by *Oliver*. Conversely, the question of whether a particular person has a reasonable expectation of privacy in a particular part of her or his land—here Reilly's cottage and woods—so as to make that piece of land part of that person's curtilage, is the type of factual inquiry suited to primary resolution by a district court.

the defendant has a legitimate expectation of privacy in the area." *United States v. Arboleda*, 633 F.2d 985, 992 (2d Cir.1980), *cert. denied*, 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981).

### A. *Proximity*

The court below found that the cottage was 375 feet away from the main residence and that the wooded area was 125 feet away. The cottage distance, taken alone, could support a finding that the search did not take place within the curtilage. But the distance between the main house and the cottage does not, in the circumstances of this case, require such a finding. The "central component" of the curtilage question remains "whether the area harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of life.'" *Dunn*, 480 U.S. at 300, 107 S.Ct. at 1139 (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)) (internal quotation marks omitted). And it is that question that the district court properly addressed.

It is of course true, as the Government argues, that a bright-line rule would be easier to administer than the fact-specific rule announced by *Dunn*. The Seventh Circuit, writing in 1976, before *Dunn*, did try to establish the "clear rule" that "any outbuilding or area within 75 feet of the house is within the curtilage and any outbuilding or area further than 75 feet is outside the curtilage." *Saiken*, 546 F.2d at 1297. But this decision cannot be reconciled with the Supreme Court's warning in *Dunn* against mechanistic application of any one factor, 480 U.S. at 301, 107 S.Ct. at 1139, and has not been accepted by other Circuits. Thus the Ninth Circuit has stated: "There is not ... any fixed distance at which curtilage ends." *Depew*, 8 F.3d at 1427. And the Fourth Circuit, even before *Dunn*, explicitly criticized the *Saiken* rule, and pointed out that "distance is just one of many factors to be weighed when determining the reach of the curtilage." *United States v. Van Dyke*, 643 F.2d 992, 994 (4th Cir.1981). The Seventh Circuit itself has not mentioned *Saiken* in the past twelve years, and its last discussion of the case implicitly challenged *Saiken*'s holding. *See United States v. Swart*, 679 F.2d 698, 702 (7th Cir.1982) (stating that *Saiken* did not cite *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and that "*Katz* would preclude an absolute rule that anything beyond a specific distance from a dwelling or business is in an area unprotected by the Fourth Amendment"). *See also United States v. Ishmael*, 843 F.Supp. 205, 209 (E.D.Tex.1994) ("[T]here are no bright lines that determine where the curtilage of a home ends."), *rev'd on other grounds*, 48 F.3d 850 (5th Cir.), *cert. denied*, — U.S. —, 116 S.Ct. 74, 133 L.Ed.2d 34 (1995).

The distance between the marijuana plants and the main residence in the case before us is admittedly large. But that is just the beginning of the inquiry. For, as the district court emphasized, curtilage may reach a larger area in a rural setting. And, as Judge Friendly observed: "In a modern urban multifamily apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control." *Arboleda*, 633 F.2d at 992 (quoting *Commonwealth v. Thomas*, 358 Mass. 771, 267 N.E.2d 489, 491 (1971)). *See also United States v. Acosta*, 965 F.2d 1248, 1255 (3d Cir.1992). On a large parcel of land, a pond 300 feet away from a dwelling may be as intimately connected to the residence as is the backyard grill of the bloke next door. And the district court's finding that the cottage area "harbor[ed] the 'intimate activity associated with the sanctity of a man's home and the privacies of life,'" 875 F.Supp. at 119–20 (quoting *Dunn*, 480 U.S. at 301, 107 S.Ct. at 1139) (internal quotation marks omitted), cannot be rejected on the ground of distance alone.

### B. *Enclosure*

The district court properly found that this factor weighed in Reilly's favor. A wire fence surrounds Reilly's land on three sides. The fence was originally constructed to prevent neighboring cattle from entering the land. Parts of it have fallen down since Reilly's neighbor stopped raising cattle. Reilly's property is also bordered by hedgerows along the east and west sides, and by thick woods on the north side. Taken together, these barriers satisfy the require-

ments of an enclosure. *See Williams v. Garrett,* 722 F.Supp. 254, 260–61 (W.D.Va.1989) ("[R]eading the word 'enclosure' in *Dunn* to require an artificial barrier seems unduly narrow. The boxwood hedge and the heavy woods created a natural enclosure around the home and yard; requiring a person to expend resources and sacrifice aesthetics by building a fence in order to obtain protection from unreasonable searches is not required by the constitution.").

Typically, the enclosure factor weighs against those who claim infringement of the curtilage when their land is divided into separate parts by internal fencing. In such situations, courts may well view the internal fencing as a boundary that sets the curtilage apart from the open fields. As the Ninth Circuit put it, "[t]he proper focus of this factor is on whether interior fencing clearly demarcates the curtilage." *Traynor,* 990 F.2d at 1158. Thus, in *Dunn* the Court noted that a fence separating a house from a barn "serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house." 480 U.S. at 302, 107 S.Ct. at 1140. Reilly has no such fence; indeed, quite the opposite. He clearly took steps to ensure his seclusion well beyond the cottage area, and this supports the district court's finding that he had a reasonable expectation of privacy there. *Cf. United States v. Lace,* 669 F.2d 46, 56 (2d Cir.) (Newman, J., concurring) ("[O]bviously the nature of the area observed, its proximity to one's home, the extent of surrounding trees and shrubs, and the general setting of the area within the larger context of the total property are all relevant in assessing the reasonableness of an expectation of privacy."), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982).

### C. Use

The district court found that this factor weighed in favor of the defendant. Reilly and his guests used "the back portion of his property for a variety of private activities." 875 F.Supp. at 118. In this respect, Judge Munson distinguished the cottage from the isolated growhouse at issue in *Dunn,* noting that Reilly used the area for fishing, swimming (at times naked), croquet, cooking, and sexual intercourse. *Id.* (We express no opinion as to whether the district court meant the above list to be in diminishing or increasing order of importance.)

Under this "actual use" test, the numerous intimate uses of the area clearly support the district court's finding that the area searched was within the curtilage. The government, relying on the Ninth Circuit's decision in *Brady,* 993 F.2d at 178, argues that they do not. It characterizes *Brady* as holding that storage of personal property in an outbuilding and its use as a children's play area cannot convert the area into an area of intimate activity. The government, however, misperceives the significance of *Brady.* In *Brady,* the district court had rejected the defendant's curtilage claim, and the Ninth Circuit was reviewing the findings for clear error. It emphasized the "conflicting testimony regarding [the use] factor," 993 F.2d at 178, and gave credence to the district court's acceptance of testimony showing that the building was uninhabited. It eschewed any iron-clad rule that occasional intimate use of property was insufficient to satisfy the use factor. Instead, it concluded only that "the district court's determination that the outbuilding is not within the curtilage of Brady's house is plausible...." 993 F.2d at 179.

In its terms, *Dunn* requires us to examine "the nature of the uses to which the area is put," 480 U.S. at 301, 107 S.Ct. at 1139 (*i.e.,* actual use). And we have done so. We note, however, that in applying this factor, *Dunn* found it "especially significant that the law enforcement officials possessed objective data indicating that the barn was not being used for intimate activities of the home." 480 U.S. at 302, 107 S.Ct. at 1140. We do not believe that this language alters the Court's earlier statements about the importance of actual use. *See Dunn,* 480 U.S. at 305, 107 S.Ct. at 1142 (Scalia, J., concurring in part) ("What is significant is that the barn was not being ... used [for intimate activities of the home], whether or not the law enforcement officials knew it.") Since the perceptions of the officers and the actual use to which the property was put coincided in *Dunn,* it would be inappropriate to assume

that the Court meant to modify the actual use test when it spoke of the officers' knowledge.

Still, if we examine "use" with reference to the objective knowledge that the officers had when they searched Reilly's land, the result would be the same. Looking at the situation on Reilly's property from the standpoint of the officers' objective knowledge, we believe that reasonable officers would expect that the cottage was likely to be used for private activities. The district court found that the cottage area "appears to have been better maintained than the lawn area between the main residence and Woodard Road." 875 F.Supp. at 118. Relying on *United States v. Sumner*, 793 F.Supp. 273, 275 (D.Kan.1992) (holding that "only the manicured area of approximately four or five acres" on a 240 acre property "constitutes the curtilage"), the court below found that Reilly had made numerous renovations to the northern portion of his land in order to use the area for recreation. 875 F.Supp. at 118. This was precisely the sort of objective data easily available to the officers. A gazebo, cottage, copse, and pond, located as they were in relation to each other and to the main residence, and maintained as these were found by the district court to be, are typically used for private activities. And the police had no data at the time they searched the property to indicate otherwise.

In this respect, we specifically reject the Government's claim that "objective data" existed because the officers had smelled a marijuana odor from the air conditioner at the side of the cottage. This so-called "objective data" was found only *after* the officers invaded the area—the edge of the cottage. As such it cannot constitute the kind of objective data about use that would lead reasonable officers to believe, when they went there, that the area was not used for private purposes. And this is in stark contradistinction to the situation in *Dunn*, where the officers stood outside the protected curtilage and noticed the odor. 480 U.S. at 304, 107 S.Ct. at 1141. Accordingly, even if the appropriate definition of the use factor were an objective one, rather than—as we believe—the actual intimate and private use made of the proper-

ty, the district court's finding that this factor runs in favor of the defendant is readily supportable.

### D. *Visibility*

The district court held that several facts relevant to visibility favored the view that curtilage extended to the whole area searched. First, the layout of the area: The cottage and wooded area were both several hundred feet away from the road. Second, the plantings on the property: Reilly had planted trees along the perimeter of the property to block visibility. Third, the grooming of the land: The park-like appearance of the area made it readily apparent to observers that the area was private. And fourth, the restrictions made on the use of the property: Reilly did not permit uninvited people on his property, and invited only a limited number to use it. 875 F.Supp. at 119. Other courts have found similar evidence relevant to this question. *See, e.g., Depew*, 8 F.3d at 1428; *Knapp*, 1 F.3d at 1029.

In arguing the contrary, the government places substantial reliance on *Krause v. Penny*, 837 F.2d 595 (2d Cir.1988). In *Krause*, we held that driveways that are "readily accessible to visitors are not entitled to the same degree of Fourth Amendment protection as are the interiors of defendants' houses." *Id.* at 597. As the court below noted, however, Reilly's cottage was not accessible to the public, and can hardly be thought of as similar to a driveway. For an analogous reason, Reilly's situation is unlike that in *Dunn*, where the defendant "did little to protect the barn area from observation by those standing in the open fields." 480 U.S. at 303, 107 S.Ct. at 1141. The protections Reilly established were enough to satisfy this factor. *See Depew*, 8 F.3d at 1428.

We have examined each of the *Dunn* factors individually and at substantial length. In the end, however, they must be evaluated as a whole. When that is done, we readily conclude that the court below correctly defined curtilage and that it did not clearly err in its findings that the cottage and wooded area were within Reilly's curtilage. We therefore affirm the district court's determination of these issues.

## II. Good Faith

██ That the search was unconstitutional does not end our inquiry. The government argues that, despite the invalidity of the search, the evidence should not be suppressed because the officers acted in good faith under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Though we are sympathetic to the good faith exception and to the notion that evidence seized under a warrant should not be excluded simply because the magistrate erred in issuing the warrant (*see supra*), we find that the good faith exception does not apply in this case.

██ Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble. For the good faith exception to apply, the police must reasonably believe that the warrant was based on a valid application of the law to the known facts. In the instant matter, the officers failed to give these facts to the magistrate. The officers presented only a bare-bones description of Reilly's land to Tompkins County Court Judge William Barrett. It was a description that was almost calculated to mislead. Moreover, the officers failed to give Judge Barrett information as to their behavior, on the basis of which he could determine whether even this scant description was itself the fruit of an illegal search that lacked the elements of good faith.

The sole affidavit in support of a search warrant, filed by Officer Ferris, omitted any reference to the 1990 search. It simply described the 1991 search, and stated that Officer Ferris and Officer Drew walked along Reilly's property until they found an area where marijuana plants were grown. It did not describe this area to the Judge. It stated that Officer Ferris saw an unoccupied one-story building (the cottage), and that the air conditioner was emitting marijuana fumes. The affidavit gave no description of the cottage, pond, gazebo, or other characteristics of the area. At no time did it provide any information regarding distances or internal fencing. The one thing the affidavit did provide was a black & white photocopy of a photograph of Reilly's land. But the photocopy is of such poor quality that it would do

Rorschach proud. In *Leon*, the Supreme Court emphasized that "the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based." *Id.* at 914, 104 S.Ct. at 3415. *See also Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978) (holding that evidence seized pursuant to a warrant based on materially false and misleading information is inadmissible at trial). We have previously held that recklessness may be inferred when omitted information was "clearly critical" to assessing the legality of a search. *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir.1991); *see also United States v. Martinez*, 869 F.Supp. 202, 208 (S.D.N.Y.1994). Here, information about the distances involved, the layout, conditions, and other like particulars of Reilly's land was crucial. Without it, the issuing judge could not possibly make a valid assessment of the legality of the warrant that he was asked to issue. The good faith exception to the exclusionary rule does not protect searches by officers who fail to provide all potentially adverse information to the issuing judge, and for that reason, it does not apply here.

There is an additional reason why *Leon* does not shield the evidence in this case. The issuance of the warrant was itself premised on material obtained in a prior search that today's holding makes clear was illegal. The facts surrounding that prior search, moreover, raise serious doubts about the officers' good faith at that earlier time. The officers went to Judge Barrett with the fruit of this prior search in hand, and it was on the basis of that evidence that they asked him to issue a warrant. Yet the officers never gave Judge Barrett a full account of what they did. And without such an account, Judge Barrett could not possibly decide whether their conduct was sufficiently illegal and in bad faith as to preclude a valid warrant. This fact, by itself, makes *Leon* inapplicable.

In deciding that the good faith exception does not apply when officers do not provide an issuing judge with details about their conduct during a pre-warrant search, we do not hold that the fruit of illegal searches can

never be the basis for a search warrant that the police can subsequently use in good faith. We do not need to reach that question, just as we do not need to decide whether the officers' conduct in the earlier search was, in fact, in bad faith as well as illegal. *Leon* commands us to exclude evidence "only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." 468 U.S. at 918, 104 S.Ct. at 3418. We take that caution seriously and today go no further than to hold that the purposes of the exclusionary rule are served by exclusion of the evidence in this particular case.

*Leon* held that the exclusionary rule is designed to deter police misconduct, and that this goal is not furthered by the exclusion of evidence obtained under a defective warrant issued in error by a magistrate. *Leon*, 468 U.S. at 916, 104 S.Ct. at 3417. Thus, had the officers here simply acted with reasonable reliance on a search warrant later found invalid, we would have no hesitation in ordering the admission of the evidence. But it is one thing to admit evidence innocently obtained by officers who rely on warrants later found invalid due to a magistrate's error. It is an entirely different matter when the officers are themselves ultimately responsible for the defects in the warrant. And that is precisely the case here, since the data presented to the issuing judge did not allow him to decide whether the evidence of wrongdoing was itself obtained illegally and in bad faith by the officers seeking the warrant.

The government places substantial reliance on *United States v. Thomas*, 757 F.2d 1359 (2d Cir.), *cert. denied sub nom. Fisher v. United States*, 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985). In *Thomas*, an agent signed an affidavit for a warrant to search an apartment, listing three grounds for its issuance: 1) the result of a canine sniff outside of the apartment; 2) the fact that a reliable informant had identified the defendant as a narcotics dealer; and 3) the fact that the defendant had acted suspiciously when arrested the previous day. *Id.* at 1366. This Court found that the canine sniff was the only possible support for probable cause, and that the sniff violated the Fourth Amend-

ment. *Id.* at 1366–67. Nevertheless, this Court, in an opinion rendered a few months after *Leon*, held that *Leon* prevented exclusion of the evidence. *Id.* at 1368.

*Thomas* presents facts totally different from those in this case, however. The officer in *Thomas* made clear to the magistrate that he was seeking the search warrant in part on the basis of a canine sniff. And until *Thomas* was decided, no court in this Circuit had held that canine sniffs violated the Fourth Amendment. Indeed, the Supreme Court had recently affirmed our decision in *United States v. Place*, 660 F.2d 44 (2d Cir.1981), declaring a canine sniff to be "*sui generis*" because it "is much less intrusive than a typical search." *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983). The officer who presented the canine sniff evidence to the magistrate was clearly acting in good faith in doing so. He did not have any significant reason to believe that what he had done was unconstitutional. In admitting the evidence, we explicitly noted that "[t]here [was] nothing more the officer could have or should have done under these circumstances to be sure his search would be legal." 757 F.2d at 1368.

The officers in the case before us did something very different. That curtilage was protected by the Fourth Amendment had clearly been established by *Dunn*. And though the boundaries of curtilage are naturally and necessarily imprecise, the officers undertook a search that caused them to invade what they could not fail to have known was potentially Reilly's curtilage. They then failed to provide Judge Barrett with an account of what they did. It may be that the evidence they finally found was in an area that only today has been held to be within the curtilage. But this fact does not make the search as a whole and their actions in not describing it to the judge the kind of behavior to which the term good faith can be applied.

To put the point in terms of *Thomas*, there was a lot "more the officer[s] could have or should have done under these circumstances to be sure [their] search would be legal." 757 F.2d at 1368. Indeed, they knew very well that large parts of their search were

potentially illegal—and yet they never told the issuing judge about it. That the part of their search that ultimately gave rise to the evidence submitted to the judge may only have been clearly illegal in retrospect doesn't alter this fact. And it certainly doesn't make the officers' conduct any less subject to proper deterrence. If, in other words, the police in *Thomas* had a) entered the house illegally with the dog, b) once inside the house had the dog smell to his nose's content, c) then exited and conducted an *ex post* illegal canine sniff outside the house, and finally, d) on the basis of this last sniff sought a warrant and did so without telling the issuer of the warrant about their incursion into the house, that faulty warrant could not possibly justify application of the good faith exception.

*Thomas*—a case where the officer described the pre-warrant canine sniff to the issuing judge, 757 F.2d at 1366, and the judge determined, incorrectly, as it later turned out, that the sniff was legal—certainly does not hold to the contrary. By recognizing that, in this case, good faith was precluded by the officers' failure to provide the issuing judge with the details of their dubious pre-warrant conduct, we affirm the *Thomas* principle that in cases where "[t]here [was] nothing more the officer could have or should have done under these circumstances to be sure his search would be legal," 757 F.2d at 1368, the evidence need not be excluded.

Other courts have criticized *Thomas*, and thus have gone further than we do today. As the Ninth Circuit put it: "The constitutional error was made by the officer in this case, not by the magistrate as in *Leon.* The *Leon* Court made it very clear that the exclusionary rule should apply (i.e. the good faith exception should not apply) if the exclusion of evidence would alter the behavior of individual law enforcement officers or the policies of their department." *United States v. Vasey,* 834 F.2d 782, 789 (9th Cir.1987). This rule was reaffirmed two years later. *United States v. Wanless,* 882 F.2d 1459, 1466 (9th Cir.1989) ("The mere fact that the officer

requesting the warrant is truthful about the evidence he submits in support of the warrant is insufficient. We have recently decided that the good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search.") (citation omitted). *See also United States v. Reed,* 15 F.3d 928, 933 (9th Cir.1994) (holding that observations made a during prior illegal search should not have been included in the affidavit for the search warrant) (citing *Vasey* ). The Eighth Circuit reached a similar conclusion. *United States v. O'Neal,* 17 F.3d 239, 243 n. 6 (8th Cir.) ("If the method by which evidence supporting a search warrant is seized is clearly illegal, then even under *Leon* ... evidence obtained under the resulting warrant should be excluded."), *cert. denied,* —— U.S. ——, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994). And other courts and commentators have agreed. *See, e.g., United States v. Villard,* 678 F.Supp. 483, 490 (D.N.J.1988) ("*Leon* did not address the admissibility of evidence seized under a warrant that was based on information obtained in a prior illegal search. Further, it would be inappropriate and inconsistent with the reasoning of *Leon* to extend the good faith exception to such a situation."); *United States v. McQuagge,* 787 F.Supp. 637, 657 (E.D.Tex.1992) (*Leon* "does not apply when, as in this case, the evidence necessary to support the magistrate's finding of probable cause is illegally obtained."), *aff'd sub nom. United States v. Mallory,* 8 F.3d 23 (5th Cir.1993) (table); Craig M. Bradley, *The "Good Faith Exception" Cases: Reasonable Exercises in Futility,* 60 Ind.L.J. 287, 302 (1985) (arguing that *Leon* should not insulate prior illegal searches that form the basis of the warrant). *See also State v. Hicks,* 707 P.2d 331, 333 (Ariz.Ct.App.1985) (*Leon* "does not hold that a subsequent warrant validates an earlier illegal search. Police officers cannot launder their prior unconstitutional behavior by presenting the fruits of it to a magistrate."), *aff'd on other grounds sub nom. Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).[2]

---

**2.** Of course, these courts are not saying that the fact that evidence from a prior illegal search is included in an affidavit for a search warrant, by

itself, invalidates every warrant containing such evidence. "The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the

But this is neither the time nor the place to reconsider our holding in *Thomas* and we do not wish to do so. The officers' failure in the case before us to provide the issuing judge with information about their search precludes a finding of good faith on their part. And it is enough for us to make clear that *Thomas* in no way protects evidence obtained on the basis of a warrant which, like this one, was gotten not only illegally but in clear bad faith.

## CONCLUSION

Because the district court's findings, on the basis of which it correctly concluded that the search in this case constituted an illegal invasion of the defendant's curtilage, were not clearly erroneous, and because the good faith exception, valuable though it is, does not apply on these facts, we affirm the decision of the district court.

---

warrant or the evidence seized pursuant to the warrant." *Vasey,* 834 F.2d at 788 (citations omitted). Rather, "[a] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Id. See also Reed,* 15 F.3d at 933 (same). Thus, if police had an "independent source" for discovery of the evidence, then the exclusionary rule would not apply. *See, e.g., Segura v. United States,* 468 U.S. 796, 805, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984).