07-0063-cr
*United States v. Hayes*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2007

(Argued:  May 14, 2008                                        Decided:  December 24, 2008)

Docket No. 07-0063-cr

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

DERRICK HAYES,

Defendant-Appellant.

_____

Before:  MINER, McLAUGHLIN, and POOLER, Circuit Judges.

Defendant-appellant appeals from a January 10, 2007 judgment of conviction and sentence entered in the United States District Court for the District of Vermont (Sessions III, C.J.), following a guilty plea to one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), the District Court having (1) denied defendant's motion to suppress evidence and dismiss the indictment; and (2) sentenced defendant to time served, a term of home confinement of 6 months, and a term of supervised release of 3 years.

AFFIRMED.

PAUL S. VOLK, Blodgett, Watts, Volk & Sawyer, P.C., Burlington, Vermont, for Appellant.

WENDY L. FULLER, Gregory L. Waples, Assistant United States Attorneys, on the brief (Thomas D. Anderson, United States Attorney for the District of Vermont), Burlington, Vermont, for Appellee.

MINER, Circuit Judge:

Defendant-appellant Derrick Hayes ("Hayes") appeals from a January 10, 2007 judgment of conviction and sentence entered in the United States District Court for the District of Vermont (Sessions III, C.J.), following a guilty plea to one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). The court imposed a sentence of time served, a term of home confinement of 6 months, and a term of supervised release of 3 years.

Prior to Hayes's guilty plea, the District Court had denied, in a May 5, 2006 Amended Opinion and Order, Hayes's motion to suppress evidence seized by police officers in and near his residence and to dismiss the indictment. The District Court's ruling resulted from its conclusions, inter alia, that (1) the police canine's initial sniff and alert to the possible presence of narcotics was not an unreasonable search because Hayes did not possess a reasonable privacy interest in the air in front of his residence containing the scent of narcotics; (2) Hayes did not have a reasonable expectation of privacy in a vegetated area approximately 65 feet from the rear of his residence, where a black bag containing narcotics was detected and seized by the police canine; and (3) the police officer's inspection and opening of the black bag containing

2

narcotics was not a search and seizure implicating the protections of the Fourth Amendment because Hayes lacked a reasonable expectation of privacy in the bag's contents.

On appeal, Hayes challenges these conclusions. Hayes's principal claim is that the area of scrub brush where the black bag containing cocaine was discovered by the police canine was within the "curtilage" of his home, and the canine's search of that area constituted an unlawful search for purposes of the Fourth Amendment. For the reasons that follow, we agree with the District Court's denial of Hayes's motion to suppress and therefore will not disturb the judgment of conviction and sentence.

## BACKGROUND

At a suppression hearing held on February 16, 2006, the District Court heard testimony and received into evidence police reports and other documents submitted by the parties. The following factual narrative is based upon factual findings made by the District Court after the hearing was concluded.

Shortly before 7:00 a.m. on September 3, 2002, Colchester, Vermont police and rescue personnel responded to a 911 call of a possible cocaine overdose at Hayes's residence located at 115 Marble Island Road in Colchester, Vermont. Police and rescue personnel arrived upon the scene and ultimately transported Hayes to the hospital by ambulance. After the ambulance left, police officers spoke with Hayes's girlfriend, Lynn Hepner, who occupied the residence, "on a somewhat regular basis," with Hayes. She gave the police officers consent to search the residence. During the course of the search, the officers discovered a duffel bag containing marijuana residue, a glass jar with some white residue believed to be cocaine, and a cigar box containing a sizable amount of cash, additional white residue, and a quantity of marijuana.

The officers decided to "be safe at that point," suspended their search of the residence, and applied for a search warrant. The officers sought a warrant because they "found much more than [they] were anticipating" and believed that the contraband found was possible evidence of a drug distribution operation. For the next couple of hours, Officer Michael Akerlind stood by alone at the Hayes residence and waited for the other officers to secure a search warrant.

At approximately 10:17 a.m., Officer David Dewey, who had participated in the consensual search, returned to the residence. He was accompanied by his canine, "Kilo." Officer Dewey was trained as a narcotics dog handler, and Kilo was trained as a narcotics canine. As Officer Dewey awaited the warrant, he decided to let Kilo out of the car because the dog had been confined in the police cruiser for four to five hours at that point. Once outside the car, which was parked in front of the house, Officer Dewey began to play with Kilo, using a frisbee. He threw the frisbee into Hayes's front yard in a trajectory "parallel to Marble Island Road." Kilo chased after the frisbee for a short distance, stopped and pointed its nose in the air as if it were alerted to something. At that point, Officer Dewey asked Kilo: "Whatta ya got?" According to Dewey, this was a verbal signal to encourage the dog to continue investigating.

As a result of the verbal command, Kilo "started sniffing around the outside perimeter of the house."[1] Officer Dewey testified that Kilo went around the right side of the house and

---

[1] The District Court described the Hayes property and area where Kilo discovered the black bag as

> a one-floor single-family house in a residential area surrounded by bushes and trees. An observer standing in the street and facing the house could see a driveway leading along the left-hand side of the lot to a detached garage standing behind and to the left of the house. To the left, running parallel to the driveway, a

4

continued around to the rear of the residence and towards the back of the detached garage. The detached garage was behind and to the left of the main residence. Kilo headed straight across the rear of the garage and towards the "brush line or hedgerow" located on the left side of the Hayes property. Dewey also stated at the hearing that Kilo "didn't really sniff around the garage at all" and that the scrub brush, which Kilo "dove into" and found the black bag in, was located approximately 65 feet from the back door of the residence. Officer Dewey also testified that the scrub brush was about 10 to 15 feet thick.

When Officer Dewey called for Kilo to return, Kilo returned with a black, nylon purse-type bag (the "black bag") in its mouth. Officer Dewey instructed Kilo to "leave it," and Kilo spit the bag out of its mouth at Officer Dewey's feet. Officer Dewey then opened the black bag and discovered a number of plastic baggies containing white powder that was later identified as approximately 14 ounces of cocaine. A short time later, just before 11:00 a.m., other Colchester officers arrived with a search warrant signed by Vermont State Court Judge Ben Joseph, but it does not appear that any contraband was seized pursuant to the warrant.[2]

10 to 15 foot wide strip of brushy vegetation separated Hayes's yard from the neighboring property. The spot that attracted Kilo's interest was inside this vegetated area, adjacent to the side lawn and approximately 65 feet from the rear door of the house. The area was separated from the house by the garage, but there was no fence or other barrier between it and the street.

[2] The search warrant described the Hayes property as a single-story house with a detached garage, in a residential area, and it authorized a search of the following:

The residence located at 115 Marble Island Road, Colchester, Vermont. This residence is a white one level ranch style house. The residence has a small front porch and a white garage that is not attached to the main residence. The residence has a number 11 affixed to the front of the house. The residence is set back from the roadway and has a dirt driveway.

5

Following his arrest, Hayes was charged, on April 14, 2005, in a one-count indictment with possessing with the intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). On September 6, 2005, Hayes filed a Motion to Suppress Evidence and a Motion to Dismiss. Hayes argued, inter alia, that: (1) the initial canine sniff constituted a warrantless search of the property; (2) Kilo's subsequent search of the property invaded the curtilage and thus was improper; and (3) Officer Dewey illegally searched the black bag after it was retrieved by Kilo.[3] Following a hearing held on February 16, 2006, the District Court denied Hayes's motion in a written opinion issued on May 5, 2006. The District Court rejected the argument that the initial canine sniff constituted an illegal search. Citing United States v. Place, 462 U.S. 696 (1983), and distinguishing Hayes's case from this Court's decision in United States v. Thomas, 757 F.2d 1359 (2d Cir. 1985), the District Court reasoned that "Kilo's sniff in this case merely assessed the contents of the air in Hayes's front yard, an area which . . . is entitled to a lesser degree of Fourth Amendment protection that [sic] the interior of the residence."

The court also rejected the argument that Kilo improperly searched the curtilage of the property. The court analyzed the curtilage factors set forth in United States v. Dunn, 480 U.S. 294 (1987), and United States v. Reilly, 76 F.3d 1271 (2d Cir. 1996), and considered whether Hayes had any expectation of privacy in the area where Kilo found the black bag. The court ruled that Hayes did not because the brushy area to the left of and behind the garage was not

_____

[3] Hayes also moved to suppress the duffel bag containing the marijuana residue, the glass jar with the cocaine residue, and the cigar box containing cash and marijuana that were discovered pursuant to the consensual search of his home. The District Court denied the motion with respect to the evidence discovered within Hayes's home, and Hayes does not challenge that portion of the District Court's May 5, 2006 order denying his motion to suppress.

within the curtilage of the home. Finally, the court determined that, contrary to Hayes's claims, Officer Dewey did not violate the Fourth Amendment when he opened the bag retrieved by Kilo. According to the court, Hayes, like the defendant in United States v. Arboleda, 633 F.2d 985 (2d Cir. 1980),

> lost any reasonable expectation of privacy by throwing or causing [the bag] to be thrown into the bushes at the edge of his property. . . .
>
> . . . .
>
> Hayes manifested no intent to prevent access to the bag or its contents by locking it or taking other affirmative steps to protect it from passersby and animals. The bag was casually thrown to the edge of Hayes's lot; in fact, it may even have landed on his neighbor's property. As in Arboleda, under these circumstances, even if Hayes did not intend to relinquish possession of the bag on a permanent basis, he lacked a reasonable expectation of privacy in its contents, and Officer Dewey's inspection of the bag was not improper.

After the District Court denied his motions, Hayes pleaded guilty, pursuant to a plea agreement, to an information charging him with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). Under the terms of the plea agreement, Hayes specifically reserved his right to appeal the denial of his motion to suppress and agreed not to appeal the aspect of the District Court's order related to the consensual search of his home. We therefore express no opinion as to that part of the District Court's order.

**ANALYSIS**

I.    Standard of Review

In reviewing a district court's denial of a motion to suppress, factual determinations are reviewed for clear error and conclusions of law are reviewed de novo. See Ornelas v. United States, 517 U.S. 690, 698–99 (1996). Review of a district court's curtilage decision involves

7

the same analysis. "[W]hile most curtilage cases concern factual determinations about use, privacy, and other such questions, which are reviewable for clear error only, these factual findings are themselves subject to a legal framework which is, of course, reviewable in a plenary fashion." United States v. Reilly, 76 F.3d 1271, 1275 (2d Cir. 1996).

II.     The Initial Sniff

"The Fourth Amendment 'protects people from unreasonable government intrusions into their legitimate expectations of privacy.'" United States v. Thomas, 757 F.2d 1359, 1366 (2d Cir. 1985) (quoting United States v. Chadwick, 433 U.S. 1, 7 (1977)). Where evidence is secured in violation of the Fourth Amendment's protection against unreasonable searches, the evidence may be excluded from the prosecution's case against the defendant whose Fourth Amendment rights were violated. See Weeks v. United States, 232 U.S. 383, 398 (1914). A Fourth Amendment "search," however, does not occur unless the search invades an object or area where one has a subjective expectation of privacy that society is prepared to accept as objectively reasonable. See Illinois v. Caballes, 543 U.S. 405, 408 (2005) ("Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment." (internal quotation marks omitted)). In this regard, the home or an individual's "dwelling place" has been afforded a "heightened privacy interest." Thomas, 757 F.2d at 1366.

Both the Supreme Court and this Court have held that "[c]anine sniffs are recognized as being less intrusive than a typical search used to determine the presence of contraband, and the practice of using trained dogs to sniff baggage at airports has been held not to constitute a search." Thomas, 757 F.2d at 1366 (citing United States v. Place, 462 U.S. 696 (1983); United States v. Waltzer, 682 F.2d 370, 373 (2d Cir. 1982); United States v. Bronstein, 521 F.2d 459,

8

463 (2d Cir. 1975)). And, insofar as the presence of narcotics is revealed by a canine sniff, the Supreme Court has held that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interest.'" See Caballes, 543 U.S. at 408–09 (holding that a canine sniff during a traffic stop is not a search (quoting United States v. Jacobson, 466 U.S. 109, 123 (1984)); see also id. at 409 (holding that "the use of a well-trained narcotics-detection dog — one that 'does not expose noncontraband items that otherwise would remain hidden from public view' — during a lawful traffic stop, generally does not implicate legitimate privacy interests" (quoting Place, 462 U.S. at 707)); Place, 462 U.S. at 707 (holding that a canine sniff of luggage at an airport is not a search). "This is because the expectation that certain facts will not come to the attention of the authorities is not the same as an interest in privacy that society is prepared to consider reasonable." Id. at 408–09 (internal quotation marks omitted).

Consistent with the strong expectation of privacy in the sanctity of one's home, however, this Court has held that a canine sniff at the door of an apartment — even if the only function of the sniff is to reveal illegal narcotics inside that apartment — is nonetheless a "search" subject to the constraints of the Fourth Amendment. See Thomas, 757 F.2d at 1367. As we explained in Thomas, with regard to a canine sniff at the door to an apartment that revealed narcotics inside the apartment, "the defendant had a legitimate expectation that the contents of his closed apartment would remain private." Id. at 1367. This Court explained that although a dog's

> sniff in an airport is not a search, [it is] quite another [thing] to say that a sniff can never be a search. The question always to be asked is whether the use of a trained

9

dog intrudes on a legitimate expectation of privacy. While one generally has an expectation of privacy in the contents of personal luggage, this expectation is much diminished when the luggage is in the custody of an air carrier at a public airport.

. . . .

. . . Although using a dog sniff for narcotics may be discriminating and unoffensive relative to other detection methods, and will disclose only the presence or absence of narcotics, see United States v. Place, it remains a way of detecting the contents of a private, enclosed space. With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses.

Thomas, 757 F.2d at 1366–67 (citations omitted).

Hayes urges us to declare that the sniff by Kilo was an illegal search, relying on our decision in Thomas. Hayes reasons that he had a legitimate expectation of privacy that extended to the area where the sniff occurred and that the sniff, therefore, was a search. From this, Hayes contends that the strong Fourth Amendment protection traditionally granted to the sanctuary of the home also applies to scrub brush located 65 feet from the back door of his house and on the border of his neighbor's property, as well as in the front yard where the initial sniff took place. Hayes claims that this case is distinguishable from Place because the area "closely surrounding [his] home" is unlike a public place such as an airport.

We reject Hayes's arguments and his reliance on Thomas and hold that the police canine's act of sniffing for narcotics here did not violate Hayes's "legitimate expectation that information about perfectly lawful activity will remain private." Caballes, 543 U.S. at 410. Thomas is clearly distinguishable from the facts of this case. The contents of the black bag that Kilo smelled were not located inside Hayes's dwelling or residence but in brush outside the house, approximately 65 feet from the back door of the residence and bordering an adjoining

property. A critical consideration in Thomas, one not present here, was that the canine there smelled the presence of narcotics located inside the defendant's home.

Hayes also relies on Kyllo v. United States, in which the Supreme Court held that the use of a thermal imaging device to detect heat — presumably from lamps used to grow marijuana — inside a home was an unreasonable search. 533 U.S. 27, 40 (2001). Hayes likens the canine's enhanced sense of smell to the thermal imaging device at issue in Kyllo. But in Kyllo, like in Thomas, the means of detection was directed inside the defendant's home. Here, the canine's sense of smell was directed towards an area 65 feet behind the back door of the home.

In its order, the District Court designated the area where the sniff occurred as "the air in Hayes's front yard." United States v. Hayes, No. 05-52-cr, at *18 (D. Vt. May 5, 2006). We agree with the District Court that Hayes had no legitimate expectation of privacy in the front yard of his home insofar as the presence of the scent of narcotics in the air was capable of being sniffed by the police canine. See Caballes, 543 U.S. at 409–10. The record indicates, and the lower court so found, that the front yard where the dog sniff occurred was clearly within plain view of the public road and adjoining properties.

The sanctuary of the home simply does not extend to the front yard of Hayes's property, where the initial sniff occurred. See United States v. Titemore, 437 F.3d 251, 259 (2d Cir. 2006) (holding that a homeowner has no reasonable expectation of privacy in a patch of front lawn visible from the road and leading up to the front porch); see also United States v. Oliver, 466 U.S. 170, 179 (1984) ("[O]pen fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or

11

surveillance . . . . Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be."); accord Esmont v. City of New York, 371 F. Supp. 2d 202, 212 (E.D.N.Y. 2005) ("Unobstructed, open areas in front of a residence are not entitled to Fourth Amendment protection.").

III.     Path to the Contraband

The heightened privacy interest afforded to a dwelling place extends to the curtilage, which has been described as an "area to which extends the intimate activity associated with the sanctity of a [person's] home and the privacies of life." Oliver, 466 U.S. at 180.

In United States v. Dunn, 480 U.S. 294 (1987), the Supreme Court reaffirmed the principle of curtilage first set forth in Oliver and set forth four factors to be considered in determining whether an area was within the curtilage of a home and entitled to the same privacy protections as the home. Dunn held that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself . . . . [T]he central component of this inquiry [is] whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." 480 U.S. at 300 (internal quotation marks omitted). The factors identified in Dunn require a court to examine: (1) the area's proximity to the main residence; (2) any enclosure of the property or area; (3) use of the property or area; and (4) steps taken to protect the property or area from view. Id. at 301; accord United States v. Reilly, 76 F.3d 1271, 1276–79 (2d Cir. 1996) (quoting and applying the Dunn factors).

This Court also has recognized that, even with the application of the factors enumerated

12

in Dunn, "two principal questions, objective and subjective," with respect to curtilage must be resolved under the Fourth Amendment analysis: (1) "whether society would recognize the particular area claimed as within the curtilage of the home"; and (2) "whether the defendant has manifested a subjective expectation of privacy in that area." Titemore, 437 F.3d at 258. Titemore held that it is thus "possible that an area might fall within the curtilage of the home, as that concept was defined at common law, but the owner or resident may fail to manifest a subjective expectation of privacy in that area." Id. at 258–59 (citing 1 WAYNE R. LaFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.3(f), at 559 (4th ed. 2004) (stating the "portion of the curtilage [that is used as a] normal route of access for anyone visiting the premises[] is 'only a semi-private area'" (quoting United States v. Magana, 512 F.2d 1169, 1171 (9th Cir. 1975)))); see also Oliver, 466 U.S. at 178–80 (explaining that curtilage represents the extent of the area surrounding a home that is capable of being recognized as private under the objective component of the reasonable expectation of privacy test).

"The touchstone of our inquiry, therefore, remains whether [the defendant] had a reasonable expectation of privacy in [the area near the home that he claims to be protected by the Fourth Amendment]." Titemore, 437 F.3d at 259 (quoting Reilly, 76 F.3d at 1276); see also United States v. Ventling, 678 F.2d 63, 66 (8th Cir. 1982) (per curiam) ("The standard for determining when the search of an area surrounding a residence violates fourth amendment guarantees no longer depends on outmoded property concepts, but whether the defendant has a legitimate expectation of privacy in that area." (citation omitted)); Magana, 512 F.2d at 1170 ("The driveway where Magana was arrested was within the curtilage of the house Magana was

13

using, but 'a reasonable expectation of privacy,' and not common-law property distinctions, now controls the scope of the Fourth Amendment." (citation omitted)).

Hayes contends that the path taken by Kilo towards the black bag trespassed upon the curtilage of the home and that Kilo's movements therefore violated the Fourth Amendment and his expectation of privacy. For the reasons stated by the District Court in its analysis, we agree that Kilo did not invade the curtilage of Hayes's home when en route to the black bag:

> There were at least two routes from the front yard to the spot where the bag was located: (1) the route that Kilo chose, to the east of the house and through the backyard, and (2) along the driveway, to the west of the house and garage. Following the analysis discussed above, the second route, which was in full view of the street for its entire length, was plainly outside of the curtilage. Given that the cocaine smell was so strong that Kilo could detect it from over 65 feet away, there is every indication that if Kilo had been restrained from following the route behind the house, he would have led Officer Dewey to the bag via the second route.

Even assuming arguendo that Kilo, while en route to the black bag, did pass through an area that might be recognized as curtilage, such a transient trespass does not implicate the Fourth Amendment where the incriminating evidence is discovered outside the curtilage. See United States v. Traynor, 990 F.2d 1153, 1157 (9th Cir. 1993) ("[I]t does not matter that officers first trespass upon property that is obviously curtilage . . . as long as the incriminating observations themselves take place outside the protected curtilage."), overruled on other grounds by United States v. Johnson, 256 F.3d 895 (9th Cir. 2001) (en banc). We agree with the Traynor court that the "obvious implication of Dunn," in which police officers first entered the defendant's property before making observations of a barn, "is that observations . . . while they are not within the curtilage of a house do not constitute a search under the Fourth Amendment." Traynor, 990 F.2d at 1157. Kilo's observation occurred in the front yard (not

14

within curtilage) when it was first alerted to the presence of contraband. See supra, Analysis Part II.

IV.    Discovery and Examination of the Contraband

Hayes contends that the scrub brush area on the left side of, and behind, the house where Kilo retrieved the bag was also within the curtilage of his home and entitled to the protections afforded by the Fourth Amendment. We examine Hayes's claim under the Dunn factors enumerated above.

As to the "proximity" Dunn factor, we reject Hayes's contention that the residential nature of his property and the neighborhood is in itself sufficient to require a finding that the borderline brush on his property was within curtilage. No Court has ever held that all areas within a parcel of residential property are "proximate" to the residence and thus curtilage. Moreover, our decision in United States v. Titemore, 437 F.3d 251 (2d Cir. 2006), counsels strongly against substituting our analysis of when there is a legitimate expectation of privacy with a rigid per se rule for finding curtilage. See id. at 259.[4] Having concluded that a per se rule is inappropriate, we find that the 65-foot distance between the back door of Hayes's residence and the scrub brush area weighs against the proximity factor. Under other circumstances, a location 65 feet from the house could satisfy the proximity factor. However, here, the scrub brush serves as a border and is located at the fringe of Hayes's property in relation to his home.

---

[4] Hayes also contends that the District Court did not consider the residential nature of his neighborhood. This contention, however, is belied by the District Court's opinion, which recognized that "although Hayes's neighborhood was residential, it was not urban." Hayes, No. 05-52-cr, at *20.

15

With respect to the second Dunn factor, whether or not the area in question was within an enclosure, Hayes argues that, although he had no enclosure around the area where the sniff occurred, the enclosure factor should also be weighed differently for him. This argument is based on his contention that properties such as those in his neighborhood are less likely to need fences. The government responds with its contention that Hayes ignores the purpose of the enclosure factor, which is to determine the areas a homeowner intended to keep private. The District Court found that the second factor also weighed against a finding of curtilage, reasoning that "[a]lthough Hayes's yard was surrounded on three sides by a natural border of vegetation, it was not fenced off from the street, nor was there a gate or any other obstacle blocking the driveway. In addition, to the extent that the edge of the mowed lawn is considered a line of demarcation, the bag was found outside of that line, within the brushy area." Hayes, No. 05-52-cr, at *18, *21.

We agree with the court's analysis as to the second factor, and note that the Supreme Court held in Oliver that "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage — as the area around the home to which the activity of home life extends — is a familiar one easily understood." 466 U.S. at 182 n.12.; cf. id. at 178 ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." (emphasis added)). Here, the record lacks any indication of any measures taken by Hayes to define the curtilage of his property or errect any barriers on his property. Although there was a natural border of brush or vegetation present, there was no indication whatsoever that Hayes tended to that vegetation or otherwise intended for it to serve as a boundary or defining point of curtilage on his

property.

As to the third Dunn factor, the intended uses of the area in question, the District Court found that "the only evidence relating to Hayes's use of the backyard and the brushy area is the fact that he used it as [a] repository for the black bag." Hayes, No. 05-52-cr, at *21–22. Hayes argues that since he mowed his lawn up to the area with the scrub brush, the District Court should have found that he made use of the scrub brush area. However, this argument is a non sequitur — whether or not the lawn is mowed does not compel or even suggest a finding of curtilage. Most homeowners, for example, mow and otherwise tend to their front lawns up to the point where the front lawn meets the public street, and simple care or maintenance of one's lawn does not transform that area of his or her property into an area of curtilage recognized as an extension of the home for purposes of the Fourth Amendment. In any event, the evidence before the District Court clearly demonstrated that the black bag was retrieved from an area beyond the mowed area. Simply because the black bag was placed in an area that Hayes expected to be immune from police discovery, a finding of curtilage cannot be supported absent evidence in the record that this area was designated and used for other intimate purposes that one might ordinarily conduct inside of one's home.

With respect to the fourth Dunn factor, steps taken to protect or shield the area in question from observation, the District Court found that this factor also weighed against a finding of curtilage because "there was no fence or other structure designed to shield the area in question, and the general area where the bag was found was visible from the street." Hayes, No. 05-52-cr, at *22. Hayes claims that the area where Kilo retrieved the bag was not visible from the road. Although, as the District Court found, "[t]he bag itself may have been naturally

17

shielded from view by vegetation," the "general area where the bag was found was visible from the street." Hayes, No. 05-52 -cr, at *22. Indeed, Officer Dewey's testimony indicated that he did not "lose sight of the dog" when Kilo entered into the scrub brush and secured the black bag.

Finally, Hayes claims that his Fourth Amendment rights were violated when Officer Dewey opened up the black bag and examined its contents. Hayes argues that Officer Dewey should have waited for the issuance of a warrant prior to opening the black bag. Indeed, Officer Dewey agreed at the hearing that there was "no reason that [he] couldn't have simply impounded the bag and waited to see whether or not there was a search warrant that was in fact going to be issued." However, because we have concluded that there was no expectation of privacy associated with the non-curtilage area where the black bag was discovered, there was similarly no expectation of privacy as to the bag and its contents. See United States v. Arboleda, 633 F.2d 985, 991 (2d Cir. 1980) (holding that the defendant "had no legitimate expectation of privacy with respect to an object which he threw outside the apartment with the objective of getting rid of it before it could be seized by the officers."); cf. United States v. Long, 176 F.3d 1304, 1308 (10th Cir. 1999) (upholding a warrantless search and seizure of garbage that had been placed outside the curtilage of defendant's home); United States v. Welbeck, 145 F.3d 493, 498 (2d Cir. 1998) ("A warrantless seizure of abandoned property does not offend the Fourth Amendment.").

V.    Conclusion

In sum, we hold that there was no error in the District Court's finding (1) that no invasion of privacy was implicated in the canine's initial sniff; (2) that the path taken by the

18

canine from the front yard to the brush where the retrieval occurred did not involve an invasion of Hayes's curtilage; and (3) that the retrieval of the black bag did not occur within the curtilage, and the examination of its contents did not offend the Fourth Amendment.

The District Court properly denied the motion to suppress evidence and dismiss the indictment, and the judgment of conviction and sentence is **AFFIRMED**.