16-3708-cr
*United States v. Alexander*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2017

Argued: October 30, 2017
Decided: May 1, 2017

No. 16-3708-cr

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

ROBERT ALEXANDER,

*Defendant-Appellant.*

B e f o r e:

LYNCH and CARNEY, *Circuit Judges*, and HELLERSTEIN, *District Judge.*[*]

---

[*] Judge Alvin K. Hellerstein, of the United States District Court for the Southern District of New York, sitting by designation.

Defendant-Appellant Robert Alexander appeals from a judgment entered in the United States District Court for the Eastern District of New York (Carol Bagley Amon, *J.*) convicting him of one count of being a felon in possession of a firearm. Before trial, the district court denied Alexander's motion to suppress two firearms recovered from his property in a warrantless search without probable cause, holding that there was no Fourth Amendment violation because the firearms were found outside the curtilage of Alexander's home. Alexander argues that that decision was in error. We agree, and VACATE the judgment of conviction, REVERSE the denial of the suppression motion as to the two firearms, and REMAND the case for further proceedings.

Judge HELLERSTEIN concurs in the judgment in a separate opinion.

---

AMY BUSA, Assistant United States Attorney (Ryan C. Harris, Assistant United States Attorney, on the brief) for Bridget M. Rohde, Acting United States Attorney for the Eastern District of New York, Brooklyn, New York, *for* Appellee.

ALLEGRA GLASHAUSSER, Federal Defenders of New York, Inc., Appeals Bureau, New York, New York, *for* Defendant-Appellant.

---

GERARD E. LYNCH, *Circuit Judge*:

Defendant-Appellant Robert Alexander was convicted of being a felon in possession of a firearm after police, without a warrant or probable cause, searched a portion of his property and discovered two guns inside a bag. The

United States District Court for the Eastern District of New York (Carol Bagley Amon, *J.*) denied Alexander's motion to suppress the guns before trial. Alexander now seeks to vacate his conviction on the ground that the district court's suppression ruling was in error. His appeal presents the narrow question of whether the area where police discovered the guns formed part of the "curtilage" of Alexander's home and was thus entitled to Fourth Amendment protection that the district court determined was not due. For the reasons that follow, we VACATE Alexander's conviction, REVERSE the denial of the suppression motion as to the guns, and REMAND for further proceedings.

**BACKGROUND**

The following facts, which are drawn from the record of the suppression hearing, are largely undisputed.

Alexander lived in a narrow house on Staten Island. The front of the house faced the street, and a short set of stairs led directly from the sidewalk to the front door. The property also included an 84-foot-long driveway that ran perpendicular to the street and alongside the home. The driveway extended past the back of the house, and at the end of the driveway, in the backyard, was a

3

shed. Alexander used the part of the driveway in front of the shed for parking, barbeques, and relaxation. There was fencing on three sides of the property, though not on the side facing the street.

One night, Alexander was standing with a woman in his front yard, a bottle of vodka in hand. A few feet away, another man and woman sat in a car that was idling in the street, blocking Alexander's driveway.

Sometime between 3:00 and 3:30 a.m., two plainclothes police officers, Genaro Barreiro and Daniel Golat, approached the group. As they neared, the officers observed the man in the passenger seat of the car attempt to put in his pants what appeared to be a baggie of drugs. The police quickly removed the two passengers from the vehicle and discovered a plastic bag containing a substance resembling cocaine in the man's hand.

The man apparently confessed that there was more cocaine in the back seat of the car, prompting Golat to search that area for additional drugs. While Golat was doing so, Alexander announced that he was "just going to put [the liquor bottle] in the back." A. 58. (He later told Golat that he wanted to put the bottle away "out of respect" for the police officers. A. 171.) Alexander then walked down the driveway toward the backyard, stopping along the way to pick up a

4

bag that had been left next to the house. Alexander was out of view for less than a minute before returning to the officers. When he did, he had neither the bottle nor the bag with him.

After an additional police officer arrived on scene, Officer Barreiro decided to look for the items that Alexander had moved. Barreiro testified that his "suspicion level [was] high," A. 65, but it is undisputed that he had no probable cause to search Alexander's property. Nevertheless, Barreiro proceeded to walk down the driveway and eventually found the liquor bottle around the back corner of the house, next to the home's back door. Barreiro did not see the bag at that time and returned to the front yard to frisk Alexander. Barreiro then walked down the driveway once again and "into the backyard" in order to continue searching for the bag. A. 69.

Once in the backyard, Barreiro used his flashlight to scan the area and spotted the bag resting on a plastic chair by the front corner of the shed closest to the house. The chair was roughly four feet from where he had found the bottle. Barreiro walked up to the bag and saw the butt of a gun sticking out of it. Inspecting the bag more closely, he realized that there were actually two guns inside.

Alexander was arrested and charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and one count of possessing a defaced firearm in violation of 18 U.S.C. § 922(k).

Before trial, Alexander moved to suppress both the guns and the vodka bottle, arguing that Officer Barreiro violated the Fourth Amendment by searching the curtilage of Alexander's home without a warrant or probable cause. The district court held a hearing at which the officers and Alexander's sister, who lived with Alexander, testified. In an oral ruling, the court granted the motion as to the bottle, and denied it as to the guns, holding that only the former was found on the curtilage of the house.

The guns were thus admitted at trial, and the jury convicted Alexander of one count of being a felon in possession of a firearm. He was sentenced principally to 51 months' imprisonment and three years' supervised release. This appeal followed.

## DISCUSSION

At the "very core" of the Fourth Amendment "stands the right of a man to retreat into his home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). The curtilage —

6

that is, the "area adjacent to the home and to which the activity of home life extends" — is considered part of a person's home and enjoys the same protection against unreasonable searches as the home itself. *Florida v. Jardines*, 569 U.S. 1, 7 (2013) (internal quotation marks omitted). As a result, a search of the curtilage that occurs without a warrant based on probable cause or an exception to the warrant requirement violates the Fourth Amendment. *Harris v. O'Hare*, 770 F.3d 224, 234, 240 (2d Cir. 2014). By contrast, that portion of private property that extends outside a home's curtilage — what the caselaw terms an "open field" — is beyond the purview of the Fourth Amendment, and can be warrantlessly and suspicionlessly searched without constitutional impediment. *Jardines*, 569 U.S. at 6.

In this case, we must decide whether the area where Officer Barreiro found the guns was part of the curtilage of Alexander's home. If it was, it is undisputed that the guns should have been suppressed, and Alexander's conviction for possessing those guns must be vacated.

In reviewing a district court's denial of a motion to suppress, "factual determinations are reviewed for clear error and conclusions of law are reviewed *de novo*." *United States v. Hayes*, 551 F.3d 138, 143 (2d Cir. 2008), citing *Ornelas v.*

*United States*, 517 U.S. 690, 698–99 (1996). The same standard applies to a decision about curtilage. *Id.* Factual determinations about use, privacy, and the physical characteristics of a property are "reviewable for clear error only," whereas such "factual findings are themselves subject to a legal framework which is . . . reviewable in a plenary fashion." *United States v. Reilly*, 76 F.3d 1271, 1275 (2d Cir.), aff'd on reh'g, 91 F.3d 331 (2d Cir. 1996). Mixed questions of law and fact — that is, whether the "admitted or established" facts satisfy the "relevant statutory or constitutional standard" — are subject to *de novo* review as well. *Ornelas*, 517 U.S. at 696–97 (brackets omitted).

The relevant facts here are undisputed, and the framework that we must apply to them is principally informed by two Supreme Court decisions.

In *United States v. Dunn*, the Court considered whether a barn located 50 yards from a fence surrounding a ranch house was part of the home's curtilage. 480 U.S. 294, 297 (1987). The barn itself was surrounded by a separate fence, as was the entirety of the 198-acre property. *Id.* The Court held that the barn was not part of the curtilage. *Id.* at 301. It reached its decision by applying a four-factor test, which it instructed "should" be used to resolve curtilage questions. *Id.* The factors were: "the proximity of the area claimed to be curtilage to the home,

8

whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Id.*

The Court was careful to warn, however, that "combining th[ose] factors [does not] produce[] a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Id.* Instead, the factors were "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration — whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

The Supreme Court did not hear another curtilage case until decades later. In *Jardines v. Florida*, the Court was faced with a search that occurred on the front porch of a home. 569 U.S. at 7. Without reference to the *Dunn* factors, the Court held that the porch was part of the home's curtilage. *Id.* It described curtilage as the "area around the home [that] is intimately linked to the home, both physically and psychologically, and is where privacy expectations are most heightened," and suggested that a "home's porch or side garden" fell easily within that definition. *Id.* at 6–7 (internal quotation marks omitted). The Court went on to

9

recognize that the public, law enforcement included, had an implicit license to approach the front door of a home in order to "knock promptly" and "wait briefly to be received." *Id.* at 8. But, in bringing a drug-sniffing dog onto the porch, the police exceeded the scope of that implicit license, and their search was thus unconstitutional. *Id.* at 9.

That *Jardines* did not reference *Dunn* does not mean that the earlier case is no longer relevant. Indeed, in our first curtilage case post *Jardines*, we relied on the *Dunn* factors in holding that, for qualified immunity purposes, it was "clearly established that a fenced-in side or backyard directly abutting a single-family house constitutes curtilage." *Harris*, 770 F.3d at 240.

At the same time, the *Dunn* factors have never been the exclusive curtilage considerations, and are relevant only insofar as they help answer the "central" question of whether the area in question "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Dunn,* 480 U.S. at 300 (internal quotation marks omitted). *Jardines* confirms that and, further, is instructive as to the weight certain factors should receive when courts seek to answer that ultimate question. The front porch in *Jardines* was neither hidden from public view nor closed off to the public by a fence; in fact, the porch was

10

open to the public in such a way that the public had an implicit license to enter the area. None of those facts gave the *Jardines* Court any pause in declaring the porch curtilage, suggesting that the lack of fencing (relevant to the second *Dunn* factor) and the lack of steps taken to protect an area from public observation (relevant to the fourth) may be of limited significance, at least in certain residential settings. For these reasons, and as discussed below, *Jardines* undercuts certain of this Court's precedents that suggest that public visibility or public access may definitively take an area out of the curtilage.

With these principles in mind, we turn to the case at hand. We begin with the *Dunn* factors.

The first *Dunn* factor — proximity of the area to the home — weighs strongly in Alexander's favor. Unlike the barn in *Dunn*, which was 50 yards from the fence around the home, the area in front of the shed was just a few steps from Alexander's back door, and the area "'immediately surrounding and associated with the home'" is the very definition of curtilage. *Jardines*, 569 U.S. at 6, quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984). The government does not disagree.

The second *Dunn* factor — whether the area is included within an enclosure surrounding the home — is neutral. As explained in *Dunn*, this factor seeks to account for the divisions that a property owner herself has created with her property, and is premised on the notion that "for most homes, the boundaries of the curtilage will be clearly marked." 480 U.S. at 302 (internal quotation marks omitted). A "fence surrounding [a] residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house," whereas an area outside a fence surrounding a home "stands out as a distinct portion" of the property, "quite separate from the residence." *Id.* In *Dunn*, that distinction made sense. A perimeter fence encircled the respondent's 198-acre property, and a much smaller fence encircled the home; that the area in question was 50 yards beyond that interior fence supported the Court's determination that the physical layout of the property itself distinguished the area from the respondent's home and, thus, the curtilage. *Id.* at 297, 302.

It is unlikely that a property as small as Alexander's would be subdivided like the property in *Dunn*, making the second *Dunn* factor a less useful concept in this particular residential setting. In any event, Alexander neither fully enclosed

12

any part of his property with fencing, nor separated the area in front of the shed from the home by running a fence between them. The fencing that did exist, however, enclosed, on three sides, both the shed and the home, marking off the home and modest yard and driveway areas from adjoining properties — a fact that, if anything, supports Alexander. *See Reilly*, 76 F.3d at 1277–78.

To the extent the second *Dunn* factor relates more broadly to whether fencing prevented public access to the area in question, *see Hayes*, 551 F.3d at 148, our assessment of the factor doesn't change. Although there was no fencing on the street-facing side of the property, there was fencing on the other three sides, and the area in front of the shed was more than 80 feet from the street. That physical layout certainly did not invite visitors to traverse the length of Alexander's property in order to enter his backyard, and the fencing that was in place certainly would discourage such intrusions.

The third *Dunn* factor — the nature of the uses of the area — weighs at least slightly in Alexander's favor. Although the district court found that the top of the driveway's "primary use" was for parking cars, it was used "at least occasionally for recreation" such as hosting barbeques, and was continuous with the backyard area behind the house, which the district court concluded was

13

within the curtilage of the home. A. 271–72. Thus, it is an area "to which the activity of home life extends." *Jardines*, 569 U.S. at 7 (internal quotation marks omitted). In *Reilly*, we concluded that a pond located 300 feet from the defendant's home was a part of the curtilage, and observed that "[o]n a large parcel of land, a pond 300 feet away from a dwelling may be as intimately connected to the residence as is the backyard grill of the bloke next door." 76 F.3d at 1277. Alexander is more or less that "bloke," and the area in question, an order of magnitude closer to his house than the pond in *Reilly*, is where he sometimes uses his grill.

Finally, the fourth *Dunn* factor — steps taken to protect the area from public observation — weighs somewhat against a finding of curtilage. Although the area in question was set back from the street, nothing prevented the public from viewing the area from the sidewalk in front of the property, nor did the chain link fence stop neighbors in adjacent properties from observing Alexander's backyard.

Mindful that we need not mechanically apply these factors, we hold that the area from which the guns were recovered was part of the curtilage of Alexander's home. Only the fourth *Dunn* factor weighs against Alexander, and

14

that factor is not dispositive, particularly where, as here, the search took place just steps from the home in an area partially used for intimate activities.

As suggested above, *Jardines* strongly reinforces our conclusion and our weighing of the *Dunn* factors. In that case, the Supreme Court observed that a property owner's Fourth Amendment rights would be "of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity." *Jardines*, 569 U.S. at 6. A porch, like the area in front of the shed, abuts the home itself, and thus, here as in *Jardines*, the first *Dunn* factor of "proximity" strongly favors a finding of curtilage. A porch is not necessarily within a closed area, and, like the driveway in this case, is even sometimes subject to a limited license for visitors approaching the home in order to seek entry. Therefore, here as in *Jardines*, the absence of a fence marking off one part of the property as more private than the rest does not preclude a finding of curtilage. Next, both a porch and the immediate back or side yard area abutting a house, especially on a small property like Alexander's, are commonly used for family activities, even though they may also be accessible, to a limited degree and for particular purposes, to visitors, including strangers such as salespersons or indeed police officers. The area here is thus comparable to the porch in *Jardines*

15

with respect to the third *Dunn* factor. And a porch, like Alexander's driveway, is typically open to observation from passing pedestrians, even ones with no legitimate occasion to enter it. The fourth *Dunn* factor, then, though it weighs against a finding of curtilage, carries no more weight here than in *Jardines*.

Accordingly, although there is, as *Dunn* explained, no mechanical formula for balancing the factors relevant to the curtilage inquiry, the *Dunn* factors in this case line up closely with the same factors as applied to the property in *Jardines*, which the Court found to be a paradigmatic example of curtilage.

*Jardines* also helps illustrate a further distinction that is relevant to the significance of the fourth *Dunn* factor. The government places some emphasis on the fact that the area in question was visible from the street, which, we agree, weighs against a curtilage finding. But whether the general area was visible from the public sidewalk, the evidence that was seized, and even the bag that the police searched for, were not. We would have a very different case if the officer had observed the guns or other incriminating evidence from the sidewalk — just as *Jardines* would have been different if the officers had observed marijuana plants in plain view on the porch. Such an observation would give the officers probable cause to obtain a search warrant, and, depending on the circumstances,

16

an exigency of some kind might permit a warrantless entry onto the curtilage and seizure of the evidence. But absent such cause, the officers in *Jardines* were not permitted to enter onto the porch for the purpose of conducting a search, even though the porch itself was visible from the street.

We do not suggest that nothing can be said on the other side of this argument. Alexander certainly could have taken steps — placing a fence at the front of his property, erecting walls to prevent public observation of the area in front of the shed — that would have resolved the curtilage question even more clearly in his favor. But it is not necessary to turn a residential property into a fortress in order to prevent the police from "trawl[ing]" one's yard, *Jardines*, 569 U.S. at 6, unencumbered by the Constitution.

For that indeed would be the consequence of the government's position in this case. The government does not argue that there was probable cause, or even reasonable suspicion, to justify the search. Rather, it contends that the area in question falls into the category of open fields that may be investigated without a warrant or exigency, without probable cause or articulated basis for suspicion, whenever an officer decides to have a look around. As *Jardines* shows, the mere fact that a part of Alexander's modest homestead was not fully surrounded by a

fence and was visible from the street does not make that area, which directly abutted the house, which was used for recreation, and which sat more than 80 feet from the sidewalk, fair game for warrantless and suspicionless police inspection or patrol.

In urging the opposite conclusion, the government argues that "this Court has repeatedly held . . . that driveways do not constitute curtilage entitled to protection under the Fourth Amendment where, as here, they are unenclosed, unshielded, and visible and accessible from a public street." Gov't Br. 19. The three cases of ours that the government cites in support of that proposition, however, do not persuade us that the area in front of Alexander's shed should be considered an open field. All of them preceded *Jardines* and, even on their own terms, they do not sweep as broadly as the government contends.

The first of the cases, *Krause v. Penny*, 837 F.2d 595 (2d Cir. 1988), did not even attempt to distinguish between curtilage and an open field, but rather considered whether the defendant officer was entitled to qualified immunity for an arrest allegedly made in violation of *Payton v. New York*, 445 U.S. 573 (1980), which prohibits police from entering a suspect's home without consent and making a routine arrest without a warrant. We described the Supreme Court's

18

jurisprudence at the time as having "not yet delineated 'the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself.'" *Krause*, 837 F.2d at 596–97, quoting *Oliver*, 466 U.S. at 180 n.11. We noted, in addition, that a number of lower courts had determined that "areas such as driveways that are readily accessible to visitors are not entitled to the same degree of Fourth Amendment protection as are the interiors of defendants' houses." *Id.* at 597. For those reasons, among others, we held that the plaintiff's warrantless arrest on his driveway did not violate clearly established law and, therefore, the arresting officer was entitled to qualified immunity. *Id.*

Neither that holding nor the analysis that got us there compels the conclusion that the whole of Alexander's driveway constitutes an open field. In fact, *Krause* seems to proceed on the assumption that the arrest took place on, and thus the driveway there formed part of, the curtilage: were the driveway considered to fall outside the curtilage, the Fourth Amendment would have no relevance at all, and our discussion of the "degree of Fourth Amendment protection" owed to curtilage as compared to the house itself would have been unnecessary. *Id.* Moreover, the case was decided on qualified immunity grounds, and held at most that there was no clearly established law at the time

19

determining whether the officer had violated the Constitution. *Id.* at 596. Even if we were to read *Krause*, as the government does, as implying that "areas such as driveways that are readily accessible to visitors" must be considered open fields, *id.* at 597, that interpretation would be impossible to square with *Jardines*, where the front porch was deemed curtilage notwithstanding visitors' "implicit license" to enter the area. *Jardines*, 569 U.S. at 8.

The government fares no better with its next case. In *United States v. Reyes,* the defendant Reyes sought to suppress marijuana plants that his probation officer discovered while walking on a gravel driveway on the side of Reyes's home. 283 F.3d 446, 450 (2d. Cir. 2002). The district court denied the suppression motion, and we affirmed. *Id.* at 470. We held that, as a convicted felon on supervised release, Reyes had "a severely diminished expectation of privacy with respect to any home visit by a probation officer," and that the probation officer required neither probable cause nor reasonable suspicion to search his property. *Id.* at 461–62. Whether the driveway was curtilage thus had no bearing on the resolution of Reyes's appeal.

We nevertheless went on to consider in the alternative — and in dicta, for present purposes — whether the search could have been justified even if Reyes

20

had not been on supervised release. *Id.* at 465–68. We said that it could, reasoning that the driveway, which had "access for pedestrian traffic" and was not used "for activities of an intimate nature," fell outside the curtilage of the home. *Id.* at 466–67. That reasoning highlights the factual differences between *Reyes* and the present case, as the area in front of Alexander's shed was not an area that visitors ever needed to access, and the area *was* used for intimate activities.

More importantly, however, our analysis in *Reyes* rested on the principle, untenable after *Jardines*, that "[t]he route which any visitor to a residence would use is not private in the Fourth Amendment sense." *Id.* at 465 (internal quotation marks omitted, alteration in original). The public may have an implicit — but limited — license to enter an area commonly traversed by visitors, such as a driveway or a porch. But *Jardines* stands for the proposition that the existence of such a license exists is not a reason to declare the area an open field; it means only that certain police intrusions onto the curtilage may be justified, assuming the police acted within the scope of the implicit license. The government does not contend that such a license permitted the officer's nighttime search in the present case, and the dicta in *Reyes* does not persuade us that the back portion of

21

Alexander's driveway, which was not necessary to cross in order to seek entry to the home, was outside the curtilage.

The government's final case, *United States v. Hayes*, is similarly distinguishable. There, the defendant Hayes sought to suppress a bag of narcotics that a police dog had recovered from scrub brush on the border of Hayes's property. *Hayes*, 551 F.3d at 140. The principal issue on appeal was whether the brush, located 65 feet from the home, was curtilage — a question we answered in the negative. *Id.* at 145. That conclusion is of marginal relevance here.

The portion of the opinion on which the government relies addressed a different issue. Hayes also sought suppression on the ground that, even if the dog both detected and recovered the narcotics from outside the curtilage, the dog still passed over the curtilage en route to the bag. *Id.* at 146–47. We ultimately determined that it didn't matter whether the dog passed over the curtilage because "such a transient trespass does not implicate the Fourth Amendment where the incriminating evidence is discovered outside the curtilage." *Id.* at 147. In the passage the government cites, we nonetheless expressed our agreement with the district court's conclusion that the dog had not invaded the curtilage, quoting the district court as having determined that the route "along the

22

driveway, . . . which was in full view of the street for its entire length, was plainly outside of the curtilage." *Id.* We did not explain the basis for our agreement, or even describe the district court's reasoning. Yet, in our general discussion of curtilage, we once again suggested that areas used as a "normal route of access for anyone visiting the premises" may not be protected by the Fourth Amendment. *Id.* at 146. Although such access is not necessarily irrelevant to a curtilage determination, or may justify police access on an implied-license theory, *Jardines* makes clear that limited visitor access is not dispositive. In light of *Jardines*, the dicta in *Hayes* cannot persuade us to affirm.

In short, the broad principles the government seeks to glean from our precedents are either taken out of context or untenable after *Jardines*, or both. The police do not have unlimited authority to search driveways for incriminating evidence, even if the particular driveway is visible from the street, even if a fence does not block pedestrian access, and even if the public is implicitly licensed to traverse a portion of the driveway in order to seek entry into the home. Here, the portion of the driveway in front of Alexander's shed formed part of the curtilage, and the search of that area ran afoul of the Fourth Amendment.

In his concurring opinion, Judge Hellerstein suggests a provocative and novel approach to determining the constitutionality of police searches of private property other than homes or other buildings. We express no view on the desirability of revising existing Fourth Amendment law along the lines he suggests. We need not address that issue for two reasons: First, as Judge Hellerstein explicitly acknowledges, because the government does not argue that the police had reasonable suspicion that evidence of crime would be found in the area searched, let alone that reasonable suspicion could justify the warrantless intrusion of Alexander's curtilage, the approach proposed in the concurrence is not properly before us. Second, as the concurrence implicitly recognizes, the notion that reasonable suspicion might permit intrusions into curtilage that would not be justified inside the home is foreclosed by governing precedent, *see, e.g.*, *Jardines*, 569 U.S. at 6 ("[W]e have held [that the curtilage of the house] enjoys protection as part of the home itself."); *Harris*, 770 F.3d at 238–40 (refusing to grant qualified immunity for warrantless search of curtilage in absence of exigency, despite the fact that officers had probable cause), and has no basis in existing Supreme Court law regarding property searches. We leave it to the Supreme Court, should Judge Hellerstein's theory ever be presented to it, to

24

decide whether its existing approach to curtilage and open fields should be revised. Under existing law, however, the evidence used to convict Alexander was illegally seized and must be suppressed.

## CONCLUSION

For the foregoing reasons, we VACATE Alexander's conviction, REVERSE the denial of the suppression motion as to the guns, and REMAND the case for further proceedings.

ALVIN K. HELLERSTEIN, concurring:

I write separately because I believe that the majority's view of curtilage is too absolute, and because it does not give a police officer's reasonable suspicion any sway in the definition of curtilage.

It was 3:00 a.m., on a street in Staten Island. The police had stopped two men \with drugs from driving away, and arrested them. The defendant, a cousin of one of the two and the owner of the house, walked up a driveway to hide what appeared to be an opened bottle of alcohol from which he had been drinking, and to move another package from one place in his backyard to another. Officer Barreiro, tracing defendant's path up the driveway and seeing what defendant was doing, moved to the hiding spot, in the curtilage of defendant's house. Looking out, he scanned the backyard, performing a radius search of the back part of the backyard, away from defendant's residence. He spied another package, adjacent to a shack at the end of the driveway—a package that on further inspection revealed what appeared to be a gun sticking out. Another gun was inside the bag. Is that spot, adjacent to the driveway and away from the defendant's house, curtilage? The majority holds that it is, and

excludes the package of guns from being admitted into evidence. In order to suppress the evidence, the majority reverses the careful factual findings of the district judge, applying the four factors for finding curtilage set out in the controlling case of *United States v. Dunn*, 480 U.S. 294 (1987), as understood by the Supreme Court's most recent curtilage decision in *Florida v. Jardines*, 569 U.S. 1 (2013).

First, the government based its appeal, not on the ground of Officer Barreiro's reasonable suspicion, but on the district court's definition of curtilage. Had the government not made that concession, the result might have been different. I believe it is important, in defining curtilage, whether a police officer's reasonable suspicion could justify the search, and whether the protected curtilage is away from the house.

A constitutional search typically must be premised on a judicially authorized warrant based on probable cause. However, an officer may, in limited circumstances, temporarily detain and conduct a limited search on an individual's person based on the officer's reasonable suspicion. *See Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015) ("In *Terry v. Ohio*, the Supreme Court

2

'expressly recognized that government interests in effective crime prevention and detection, as well as in officer and public safety while pursuing criminal investigations, could make it constitutionally reasonable in appropriate circumstances and in an appropriate manner temporarily to detain a person' to investigate possible criminality even in the absence of a warrant or probable cause for arrest." (quoting *United States v. Bailey*, 743 F.3d 322, 331–32 (2d Cir. 2014))).

True, the Supreme Court has held that "when it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 569 U.S. at 6. But the Fourth Amendment itself makes no distinction between persons and homes, *see* U.S. Const. Amend. IV, and the Supreme Court has described the right to be secure in one's person as an "inestimable right of personal security" that "belongs as much to the citizen on the streets of our citizens as to the homeowner closeted in his study," *Terry*, 392 U.S. at 8–9. If a reasonable suspicion can justify a limited search of one's person, I believe that the Constitution could permit a similar approach in the grey area of curtilage.[1]

---

[1] Support for a more flexible approach to curtilage determinations, based on the area in question and the exercise of an officer's reason and

3

Second and relatedly, I question whether the full perimeter of protected curtilage is an absolute proposition, or one that varies based on the factors laid out in *United States v. Dunn*. *Dunn* instructs courts to consider such factors as "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301. I believe that these factors are more amenable to a sliding scale analysis, one that recognizes that a police officer, who had reasonable suspicion to follow defendant and could be subject to criticism if he had not, and who reasonably believed that the contraband would have disappeared if he had sought a warrant from a court, did not violate the Constitution.

---

judgment, has received some treatment in the academic literature. *See, e.g.*, Stephanie M. Stern, *The Inviolate Home: Housing Exceptionalism in the Fourth Amendment*, 95 Cornell L. Rev. 905, 948–50 (2010) (arguing that "[a]reas of curtilage less likely to be implicated in intimate life, such as storage outbuildings, garages, and garbage within the curtilage could be subject to a reduced standard of reasonable suspicion" and recognizing that such reform "may be quietly beginning" based on "[t]he narrowing of curtilage protection" in the lower courts).

I agree with the majority that defendant's backyard might be curtilage. It is bounded on three sides, and it is used by defendant for recreational and entertainment purposes. But it also is open to the neighbor, and anyone else who walks up the driveway, particularly a police officer who walked up the driveway because he reasonably suspected that defendant was hiding evidence of criminal conduct. No case holds that curtilage is absolute.[2] If it is an area next to a home, and

---

[2] Our discussion of this issue in *Krause v. Penny*, 837 F.2d 595 (2d Cir. 1988), is instructive. In *Krause*, which was decided after *Dunn* and addressed the scope of curtilage in the context of qualified immunity, the plaintiff was arrested while standing in his driveway after a neighbor complained of harassment. *Id*. at 596. After the trial court instructed the jury that the arrest was unlawful based on the area's proximity to the home, we reversed, holding that the officer was entitled to qualified immunity. *Id*. at 596–97. As the majority explains, *Krause* proceeded on the assumption that the driveway was within the curtilage, but we noted in *Krause* that the Supreme Court "ha[d] not yet delineated 'the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself.'" *Id*. (quoting *Oliver v. United States*, 466 U.S. 170, 180 n.11 (1984)). Recognizing that there was "substantial lower court authority for the proposition that areas such as driveways that are readily accessible to visitors are not entitled to the *same degree* of Fourth Amendment protection as are the interiors of defendants' houses," we held that the officer was entitled to qualified immunity. *Id*. at 597 (emphasis added).

I agree with the majority that *Krause* does not dictate the outcome of this case, for it concerned a more accessible area on the driveway and addressed only the officer's entitlement to qualified immunity. But *Krause* does stand for the proposition that the scope of Fourth Amendment

allows entry into the home, whether physically or by sight or smell, it surely is curtilage, and so the Supreme Court holds. *See Jardines*, 569 U.S. at 7 (calling the front porch "the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends'" (quoting *Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984)). But if the area is far enough away not to threaten privacy within the home, it has elements both of "open field" and curtilage. If a police officer invades such an area without reasonable suspicion, he is invading the home owner's Fourth Amendment privacy. But if the officer enters because of reasonable suspicion that the backyard harbors crime, and if the circumstances do not allow time to obtain a warrant, the officer should not be held to have violated the owner's Fourth Amendment rights.

In sum, I do not believe that the binary choice between "open field" and curtilage, with no reference to the reasonable suspicion held by the officer, is the appropriate way to resolve these questions. But because the government stipulated away the issue of reasonable suspicion on appeal, I concur with the decision of the majority.

---

protection in areas just within the boundary of curtilage may be more flexible than within the home itself.

6